**COMMONWEALTH OIL REFINING COMPANY, Inc.**

v.

**UNITED STATES.**

**C.D. 4248; Protests 64/8081, etc.**

United States Customs Court, First Division.

Aug. 10, 1971.

Thatcher, Proffitt, Prizer, Crawley & Wood, New York City (Robert S. Stitt and George W. Taliaferro, Jr., New York City, of counsel), for plaintiff.

L. Patrick Gray III, Asst. Atty. Gen. (Bernard J. Babb, New York City, trial attorney), for defendant.

Before WATSON, MALETZ, and NEWMAN, Judges.

WATSON, Judge:

These protests, consolidated for the purpose of trial, place in issue the classification of merchandise described as gas oil imported from Venezuela and entered at the port of Ponce, Puerto Rico during the period of 1962 through 1968. The merchandise imported between November 28, 1962 and August 31, 1963 was permitted entry free of duty pursuant to paragraph 1733 of the Tariff Act of 1930. The merchandise was, however, assessed with an import tax of one-quarter cent per gallon pursuant to sec-

tion 3422 of the Internal Revenue Code [1] as set forth in Schedule II–B of a Presidential proclamation of a supplementary trade agreement with Venezuela, T.D. 53107. This assessment was made under the descriptive language in said Schedule II–B for "(1) Liquid derivatives of crude petroleum." The merchandise entered after August 31, 1963 was classified pursuant to item 475.65 of the Tariff Schedules of the United States [2] as mixtures of hydrocarbons not specially provided for derived from petroleum in liquid form, and was assessed with duty at the rate of 0.25 cent per gallon.

Plaintiff claims that the imported merchandise entered prior to August 31, 1963 is properly described as "fuel oil derived from petroleum (including fuel oil known as gas oil): Testing under 25 degrees A.P.I." in Schedule II–B of T.D. 53107 and is subject to an import tax of one-eighth cent per gallon rather than the one-quarter cent per gallon assessed. Plaintiff further claims that the merchandise entered after August 31, 1963 is dutiable pursuant to item 475.05 of the Tariff Schedules of the United States [3] as "fuel oils * * * derived from petroleum * * * testing under 25 degrees A.P.I." and is dutiable at the rate of 0.125 cent per gallon.

In brief, this dispute is whether the importations are classifiable as fuel oil as claimed by plaintiff, or whether they are simply classifiable as liquid derivatives of petroleum and mixtures of hydrocarbon not specially provided for, as classified.

Defendant has made a motion to dismiss the protest in entry numbers P/473, P/527, P/669, P/713, P/736, P/787, P/807, P/845, P/885, P/58 and P/100 of protest number 64/24396, and entry number P/678 of protest number 64/8081, on the grounds that these protests were filed more than sixty days after liquidation, after the date on which the collector's decision became final pursuant to section 514 of the Tariff Act of 1930 and at a time when the importer could no longer challenge that decision.[4] Since this threshold motion goes to the jurisdiction of the court over the subject of these protests, we will deal with it first.

Plaintiff has countered defendant's attack on the timeliness of the protests with a claim that defendant did not give notices of liquidation in the form and manner prescribed by section 16.2(d) of the Customs Regulations of the United States [5] promulgated pursuant to section 505 of the Tariff Act of 1930.

1. 26 U.S.C. § 4521 (1958).

2. 19 U.S.C. § 1202 (1964).

3. 19 U.S.C. § 1202.

4. SEC. 514. PROTEST AGAINST COLLECTOR'S DECISIONS.

Except as provided in subdivision (b) of section 516 of this title (relating to protests by American manufacturers, producers, and wholesalers), all decisions of the collector, including the legality of all orders and findings entering into the same, as to the rate and amount of duties chargeable, and as to all exactions of whatever character (within the jurisdiction is made more than ten months after and his decisions excluding any merchandise from entry or delivery, under any provision of the customs laws, and his liquidation or reliquidation of any entry, or refusal to pay any claim for drawback, or his refusal to reliquidate any entry for a clerical error discovered within one year after the date of entry, or within sixty days after liquidation or reliquidation when such liquidation or reliquidation is made more than ten months after the date of entry, shall, upon the expiration of sixty days after the date of such liquidation, reliquidation, decision, or refusal, be final and conclusive upon all persons (including the United States and any officer thereof), unless the importer, consignee, or agent of the person paying such charge or exaction, or filing such claim for drawback, or seeking such entry or delivery, shall, within sixty days after, but not before such liquidation, reliquidation, decision, or refusal, as the case may be, as well in cases of merchandise entered in bond as for consumption, filed a protest in writing with the collector setting forth distinctly and specifically, and in respect to each entry, payment, claim, decision, or refusal, the reasons for the objection thereto. The reliquidation of an entry shall not open such entry so that a protest may be filed against the decision of the collector upon any question not involved in such reliquidation.

5. 19 C.F.R. § 16.2(d).

Pursuant to the provisions in the latter section that the collector "shall give notice of such liquidation in the form and manner prescribed by the Secretary of the Treasury," section 16.2(d) of the Customs Regulations of the United States provides that after liquidation by the collector entries shall be scheduled promptly on a bulletin notice of liquidation, Customs Form 4333. It further provides as follows:

* * * The bulletin notice of liquidation shall be posted as soon as possible in a conspicuous place in the customhouse for the information of importers or lodged at some other suitable place in the customhouse in such a manner that it can be readily located and consulted by all interested persons, who shall be directed to that place by a notice maintained in a conspicuous place in the customhouse stating where notices of liquidation of entries are to be found. The bulletin notice of liquidation shall be dated with the date of posting or, if not posted, with the date it is lodged in the above-described place for the information of importers. * * *

Plaintiff alleges that the bulletin notices of liquidation affecting the entries involved in this motion were not "posted"; were not "lodged in a conspicuous place or manner"; were not stamped with the date of posting and their was no sign in the customhouse stating where they could be found. Plaintiff asserts that these deficiencies invalidate the notices of liquidation and insulate the protests from attack on the ground that they were filed more than 60 days after the date of liquidation.

A considerable amount of testimony was adduced by both parties on the subject of the deficiency of the notices of liquidation and the conformance or nonconformance with section 16.2(d) of the Customs Regulations.

Plaintiff offered the testimony of Cesar Rivera, its supervisor of oil accounts. Based on visits to the Ponce Custom House of about one a month during the period in question, Mr. Rivera testified that there was no sign directing visitors to the place where notices of liquidation were posted; that said notices were to be found on a clipboard lying on a counter near the windows where customs business was transacted; that the date of posting was not stamped on the notices of liquidation, and they were not placed on the clipboard in any particular order.

A second witness for plaintiff was Jose R. Rodriguez, a tanker agency supervisor for the plaintiff. The period of his familiarity with the procedures in the Ponce Custom House was not made clear. He did, however, testify that on his visits there he saw no date stamps on the notices of liquidations nor was there a sign directing people to the location of the notices of liquidation.

A third witness for the plaintiff was Noel Torres, an oil accountant with the plaintiff. He testified that on a visit to the Ponce Custom House in October 1965, the clipboard in question was lying on the counter. In addition, he testified that there was no sign in the Ponce Custom House directing visitors to the place where the notices of liquidations were posted.

Defendant introduced the testimony of numerous witnesses. The first was Frank Llavat Cristy, an employee of the United States Customs Bureau at the foreign trade zone at Penuelas, Puerto Rico and prior to that at Mayaguez, Puerto Rico. This witness had visited the Ponce Custom House at least once a week for the past seven years and was familiar with the layout of that customhouse as of 1963, 1964 and 1965. In the first part of 1966, Mr. Cristy prepared a drawing of the stairs from the first floor to the second floor of the United States Custom House at Ponce and a floor plan of the second floor of said customhouse. These drawings were introduced into evidence as defendant's exhibits E–1 and E–2. Mr. Cristy indicated the location of the clipboard in question by marking exhibit E–2 with a notation A–2, placing said clipboard next to one of the windows at which business

was transacted on the second floor of the customhouse.

Defendant's second witness was Lemuel Irizarry, customs inspector at Ponce, who in February 1966 took certain photographs of the second floor of the Ponce Custom House, which he asserted were a fair representation of the conditions in that area during 1963, 1964 and 1965. These photographs were introduced in evidence as defendant's exhibit F together with five enlargements of said photographs helpfully obtained by plaintiff.

The remaining witnesses for defendant testified regarding the processing of entries, their liquidations and the notices of liquidations sent from the port of San Juan, where liquidation took place, to the subport of Ponce. This portion of the testimony lends itself to a narrative format and we will recount it accordingly.

Alberto Lergier, a liquidator at the port of San Juan between July 1963 and February 1964, testified that the liquidating official would make a final determination of duty, would stamp such statement of liquidation on the entries showing if there was an increase in duties or a refund or if the entries were to be liquidated as entered. The entry would then be transferred to a liquidating clerk who would prepare the bulletin notices of liquidation on Customs Form 4333. The liquidating clerk would stamp the entries with the date of liquidation and transfer them to the cashier's division. In the cashier's division the bill of increased duties would be prepared. In addition, at the cashier's division, the action of liquidation would be posted on a collection or log form. The bulletin notice of liquidation would be posted at the liquidation division on the date of liquidation. With regard to entries for the port of Ponce, an original and one copy of the bulletin notice of liquidation were prepared at San Juan. The original only was mailed to the Ponce Custom House by the cashier's division.

Mrs. Ana Alvarez, a miscellaneous document examiner in the classification and Value Division of U. S. Customs at San Juan, was a liquidating clerk at that office during the period between July 1963 and February of 1964. She received the entries from the liquidators and stamped the liquidation date on them and the same liquidation date on the bulletin notices of liquidation, preparing an original and two copies. The date which she stamped on the entry as the date of liquidation and the date which she placed on the bulletin notice of liquidation was a date 10 to 14 days in the future. She then took the papers to the cashier's division and delivered them personally to Mrs. Olga Mas.

Mrs. Mas was the administrative fiscal officer at the San Juan office during the period between July 1963 and February 1964. She lreceived the entries liquidated with increases together with the notices of liquidation, and would give them to a clerk for the purpose of posting the stamped date of liquidation in a log designated as Customs Form 5151–B. Mrs. Mas made entry of increased duties on Form 5151–B in the column entitled "Supplemental duties". In addition, Mrs. Mas noted on the bulletin notice of liquidation the date on which it was sent to the subport of Ponce. Thus, for example, on exhibit G–2 we note the notation "Bulletin and entries to Ponce, 12/6/63." On the log or Customs Form 5151 introduced in evidence as defendant's collective exhibit "I" and relating to the importations in question, the entries covering the notice of liquidation presumably sent to Ponce on December 6, 1963, are assigned a date of liquidation of December 18, 1963.

Fernando Ruz Arroyo was a clerk in the cashier's office of the San Juan Customs Service during the dates in question. It was part of his duties to post on the Form 5151–B the amount of increase and the date of liquidation. He then put the bulletin notices of liquidation in franked return-addressed envelopes addressed to the duty collector at Ponce, Puerto Rico. He identified his handwriting on defendant's exhibit G–1

in a note reading "Bulletin and entries to sub-port".

Francisco N. Melendez was the deputy collector in charge of the port of Ponce, Puerto Rico during the period in question. He testified with regard to the process of handling entries at the sub-port of Ponce. The entries were sent from Ponce to San Juan for liquidation and returned to Ponce for filing with the bulletin notice of liquidation. The bulletin notices of liquidation were received and initialed with the date of receipt. We note at this point that the actual bulletin notices of liquidation which were received in Ponce, that is to say, the ones bearing the initials and date of posting, were not produced by the defendant. Mr. Melendez testified that they could not be found. The documents which have been placed in evidence as defendant's exhibit G, collective exhibits H and I are the copies of said documents from the San Juan files. Mr. Melendez stated that there was no sign directing visitors to the place of posting. He further testified that the clipboard, indicated by the notation A–2 on the defendant's exhibit E–2 as a red square, was located in that position during the period in question and was normally hanging from a nail in that position. In addition he testified that the bulletin notices of liquidation were placed on the clipboard in the order they were received at the subport.

Luis F. Viera, who was a customs inspector during the period in question at the subport of Ponce, assumed certain clerical duties during that period, including the receipt of the mail from San Juan containing the entries attached to the bulletin notices of liquidation. He checked the entries in question against the list of the bulletin notices of liquidation and then initialed the entry on the Form 5151–B. According to the witness, the bulletin notices of liquidation and the entries were received about 4 or 5 days prior to the date of liquidation stamped thereon. After checking the entries against the 5151–B he passed the

bulletin notices of liquidation to Pedro J. Guzman.

Mr. Guzman was a clerk in the customhouse at Ponce during the period in question. His duties included the posting of the notices of liquidation on the clipboard in question, the one depicted in the photograph, defendant's exhibit F. He testified that no more than 1 day passed from the time he received the notice of liquidation from Mr. Viera to the time he posted it on the clipboard. Upon receiving the notice of liquidation, he typed a notice of supplemental duties, which was sent to the importer and then placed the notice of liquidation on the clipboard. He stated emphatically that the clipboard always hung on the nail. Mr. Guzman's duties also included making entries for increased duties on the Form 5151–B during the period in question.

Guillermo Tejas, was a customhouse broker, whose business took him to the Ponce Custom House daily during the period in question and some of whose clients have entries appearing on the notices of liquidation labeled exhibit G–1 and exhibit G–2. This disinterested witness who testified with impressive assurance, stated that it was his practice to look at the bulletin notices of liquidation and that the clipboard in question was usually located near one of the windows at which custom business was transacted.

▆ After reviewing the above testimony related to the circumstances surrounding the posting of notices of liquidation at the Ponce Custom House during the period in question, two points seem clearly indicated. First, there was no sign whatsoever directing visitors to the place where the notices of liquidation were located. Second, the notices of liquidation were stamped with the date of posting which coincided with the date of liquidation. On this point, the weight of evidence adduced by defendant, relying on the direct line of transmission by the customs personnel involved and their regular procedures,

convinces us that the procedures followed did result in the posting of the notices of liquidation on the date of liquidation. The infrequent dates of observation, and the less than positive assertions by plaintiff's witnesses regarding the presence of a stamped date of posting, are insufficient to overcome the sustained, coherent and connected testimony of defendant's witnesses regarding the procedures followed in posting. It is evident that such procedures, commencing with the postdating of the date of liquidation at the port of San Juan, the mailing of the notices of liquidation to the subport well in advance of the stamped date and the handling of such papers at Ponce, were designed to and did result in a posting of the notice of liquidation on the date of liquidation with a stamped date of posting on the document.

After close consideration of the record, we arrive at a conclusion regarding the third factual question, that of the location of the clipboard, and find that the clipboard was normally hung from a nail adjacent to one of the windows at which customs business was transacted. While there is conflicting testimony on this point, and it may very well be that on occasion the clipboard was lying horizontally on a counter, we give great weight to the testimony of the customs broker, Mr. Tejas, a disinterested party whose business made him a daily visitor to the customhouse. Also, while the testimony of one of the defendant's witnesses who was connected with customs operations at the Customs House in Ponce, may have been overemphatic in certain respects regarding the certainty of the placement of the clipboard, we nevertheless consider the overall testimony of defendant's witnesses to be more consistent and revealing for the entire period here in issue as opposed to the testimony of plaintiff's witnesses, who did not possess as sustained and continuous a familiarity with the location in question. There can be no doubt that on occasion the clipboard was not hanging from the nail but was lying on a counter or being utilized in other locations. However, the testimony supports our view that in the normal practice and ordinary course of procedure, the clipboard in question was suspended from a nail on the wall near one of the windows at which Customs business was transacted.

Based on the above summarized testimony, we consider the factual conditions surrounding the posting of the notice to be as follows: The notices of liquidation in question were stamped with the date of posting and were placed on a clipboard in the order of receipt, which clipboard was normally hung on the wall near one of the windows at which customs business was transacted, and there was no sign indicating the location of this clipboard. We can now turn to the legal implications of this factual situation.

The first issue is whether the location of the clipboard was "a conspicuous place in the customhouse" in keeping with the requirement of section 16.2 (d) of the Customs Regulations that "[t]he bulletin notice of liquidation shall be posted as soon as possible in a conspicuous place in the customhouse for the information of importers * *." After reviewing the legal precedents relevant to this issue, we reach the opinion that the clipboard in question was located in a "conspicuous" place in the customhouse.

In Standard Oil Co. of Louisiana v. United States, 33 CCPA 152, C.A.D. 329 (1946), the bulletin notices of liquidation were posted on a clipboard which was affixed to the wall in a two-foot deep alcove formed by a cupboard on the right and a filing cabinet on the left, and in addition was placed over a small safe in that alcove. The Court of Customs and Patent Appeals noted the definitions of the word "conspicuous" appearing in Webster's New International Dictionary, Second Edition, 1939 as "1. Obvious to the eye or mind; plainly visible; manifest. * * * 2. Attracting or tending to attract attention, as by reason of size, brilliance, contrast, or station;

striking; eminent * * *'', and concluded:

> The definitions hereinbefore noted establish beyond a doubt that when the Secretary of the Treasury prescribed that the bulletin notice of liquidation shall be posted in a conspicuous place in the customhouse he contemplated that such a notice shall be posted there in a place where such notice by reason of its position would be not only obvious to the eye of the ordinary prudent person but also that it would strike his attention in the form and manner that the information or warning publicly issued by an acknowledged authority was intended to communicate. There is nothing in either the language or the statute or the customs regulations by which the collectors of customs may discharge their legal obligation by posting the bulletin notice of liquidation not in a conspicuous place but otherwise in a place from which the notice is visible only after a careful search by an interested person.

▉ We read the above opinion in conjunction with its factual situation as supporting the view that the bulletin notice of liquidation must be posted in a place which is plainly visible and accessible to the ordinary interested person. In this respect, we do not consider that it need seize the attention of the visitor with the impact and aggressiveness of a colorful advertisement, but rather that it have a placement which is open and accessible. Thus, we would tend to emphasize definition number 1 of the above definition of "conspicuous" and place a slightly lesser emphasis on the relevant portion of definition number 2, that is to say, "[a]ttracting or tending to attract attention, as by reason of * * * station".

Buttressing this view and going even further in certain respects is the holding in Olavarria & Co., Inc. v. United States 47 CCPA, 65, C.A.D. 729 (1960). There, the testimony of plaintiff's witness was held insufficient to give the court a clear picture of the posting practices in effect during the period in question. The Court of Customs and Patent Appeals, however, went further and stated that "even assuming the notices were displayed on a desk or file cabinet instead of on a bulletin board or wall, that fact alone would not necessarily establish that they were not posted in a 'conspicuous' place within the meaning of Section 16.2(d) of the Customs Regulations."

We rely in the main on the holding in Standard Oil Co. of Louisiana v. United States, *supra*, decided under Article 818 (i) of the Customs Regulations of 1937, containing language identical to that herein, and consider that the posting of the notice of liquidation on a clipboard hung in the open, on the wall near one of the windows at which business was transacted, was a posting in a conspicuous place. Moreover, we are persuaded that the place was conspicuous by the fact that this area was the only one at which customs business was transacted in the Ponce Custom House. Thus, this clipboard was accessible and plainly visible to the ordinary prudent person without obstruction, interference or inconvenience.

The holding in Mary G. Hutchinson v. United States, 18 Cust.Ct. 64, C.D. 1046 (1947), that "the act of placing a folder containing the bulletin notice on a counter does not meet the requirements that such notices 'shall be posted * * in a conspicuous place in the customhouse'" is not in conflict with our conclusion. Whatever may be the defects of placing the notices of liquidation horizontally on a counter, they do not exist in this case where the notices of liquidation were placed or posted on a wall. Here, the bulletin notices of liquidation were posted in a conspicuous place.

▉ We now turn to the consequences of the fact that there was no sign in the customhouse directing people to that place. The remaining issue relating to the adequacy of the notice of liquidation has to do with the consequences of the

absence of a sign directing visitors to the location of posting. We are of the opinion that in the circumstances herein, where the posting is in a conspicuous place, a sign directing visitors to that place is not required by the Customs Regulations. We read the crucial sentence as being divided into two portions. The first calls for posting in a conspicuous place in the customhouse and the second deals with the situation which arises if the notices are placed in a "suitable" but not "conspicuous" place. In the former case, a notice or sign must be maintained in a conspicuous place directing interested persons to the location of the bulletin notices of liquidation. The sentence structure lends itself to this interpretation due to the fact that the conjunction "or" divides the sentence into two parts. The more logical reference of the words "that place" in the phrase "who shall be directed to *that place* by a notice" [emphasis added] is to the immediately prior portion of the sentence referring to the lodging of the notice at "some other suitable place". The division between the first and second portions of the sentence is further emphasized by the repetition of the adjective "conspicuous" in connection with the notice or sign, which leads us to treat it as the *conspicuousness* required to compensate for the *inconspicuous* location of a "suitable place", rather than a requirement for a *conspicuous* sign to direct an interested person to a *conspicuous* posting. In sum, we read the requirement of a conspicuous sign or notice as coming into effect only when the bulletin notices of liquidation are themselves not posted in a conspicuous place. A good example of a situation in which the notices of liquidation were posted in an inconspicuous area and were not the subject of a conspicuous notice, occurred in Norman G. Jensen, Inc. v. United States, 55 Cust. Ct. 336, C.D. 2599 (1965). In that case, the bulletin board on which the notices of liquidation were placed was located in a common hallway in the Federal building outside the area where customs business was transacted. Although the posting in that case was subject to numerous defects, the absence of a clear and conspicuous notice referring to the location of the bulletin board was basic.

We note that our finding herein is consistent with that in British West Indies Company v. United States, 40 Cust.Ct. 285, C.D.1995 (1958). In that case, the posting of the notices of liquidation on a clipboard attached to wire netting at a height of 64 inches from the floor in the entry room of the customhouse was held to be in a conspicuous place. The Customs Regulations in effect at the time of the entries involved therein did not contain the requirement for a sign or notice, and consequently that question was not a factor therein.

In conclusion, we find that the bulletin notices of liquidation relating to those entries covered by the protests which have been challenged as untimely were posted in a "conspicuous" place in accordance with the Customs Regulations. Consequently, the notice of liquidation was proper and the liquidation became final sixty days after the date of liquidation. Since plaintiff's protests were filed after that sixty-day period, they were untimely and must be dismissed.

Accordingly, defendant's motion to dismiss those protests for untimeliness is granted.

The principal substantive question herein is whether the importations are classifiable as "fuel oil". This would, in the ordinary course of such matters, raise immediate issues touching on the common meaning of "fuel oil" and the Congressional intent expressed in that term. In the instant case, however, plaintiff makes a contention which, if correct, takes primacy over certain other methods of statutory interpretation and will be of great weight in deciding the protests herein. Hence, this contention must properly be treated first.

Plaintiff claims that the merchandise such as that involved herein has been

classified uniformly and without interruption pursuant to the provisions for fuel oil over a period of forty-five years. Plaintiff contends that this consistent administrative practice has fixed the classification of the instant importations in a manner upon which importers have a right to rely, and which may be changed only by an act of legislation.

The testimony and evidence relevant to this issue derives from the testimony given by Sam Zamudio, a chemical engineer employed by plaintiff and the testimony of Edward J. Henry, Arthur Leo Grill and Frederick J. Pantella, respectively the district director, chief chemist and lead import specialist at the port of Philadelphia, whose depositions were marked in evidence as exhibits 31, 22 and 1–A.

Plaintiff operates an oil refinery at Guayanilla Bay on the southern coast of Puerto Rico and imports its raw materials such as crude petroleum, unfinished oils and naphtha from Venezuela.

Unfinished virgin vacuum gas oil is a distillate of petroleum separated from the crude petroleum in the initial stage of the refining process. In the form imported by plaintiff the gas burns, produces heat and power, and meets commercial specifications for No. 5 fuel oil. Plaintiff's usual practice is to further refine the gas oil to produce gasoline and No. 2 and No. 6 fuels, and not to use it as fuel in its imported condition. The testimony of the Philadelphia customs officials establishes that Philadelphia is a leading port for importations of petroleum. Mr. Pantella, the lead import specialist at the port, in charge of petroleum importations stated that until 1967 Venezuelan gas oil was consistently classified as "fuel oil derived from petroleum (including fuel oil known as gas oil)" and as "distillate * * *

fuel oil". This classification included importations represented by the importer as intended for further refinement and not for use as fuel in the imported condition. (See for example plaintiff's exhibit 8.)

The evidence herein further shows that the importations in question possess the characteristics of No. 5 fuel oil and as such are similar to the importations which were classified at the port of Philadelphia as fuel oil until 1967. Mr. Zamudio's testimony was clear in its assertion that the importations could be marketed in their imported form as No. 5 fuel oil. The court has examined a multitude of source materials placed in evidence for the purpose of clarifying the nature of fuel oils and their identifying characteristics.[6] The court has also examined the customs laboratory report cards relating to the importations. Concerning these, the parties stipulated that "[n]otwithstanding the statements on the various customs laboratory report cards that the samples did not conform to ASTM (American Society for Testing Materials) or other specifications for fuel oil, the only tests conducted of the plaintiff's gas oil importations were those specifically enumerated on the cards themselves, namely API gravity, viscosity and, in some cases, sediment and water." The important tests for flash point and ash contents were not performed. Thus the laboratory reports, as far as they went, are consistent with a finding that the importations possessed the characteristics of No. 5 fuel oil, while the positive testimony of Mr. Zamudio—unrebutted and uncontradicted—serves to establish the fact that the imported gas oil did indeed possess the characteristics of No. 5 fuel oil. Accordingly, we conclude that it is similar to Venezuelan gas oil which was entered at the port of Philadelphia.

---

6. Of particular interest in this connection were the following sources: Exhibit 28—Nelson, Petroleum Refinery Engineering (4th Ed. 1958) ; exhibit 32—U.S. Department of Commerce, Fuel Oils 1–5 (6th Ed.) ; exhibit 29—Commonwealth Oil Refining Company, Summary No. 5 Fuels, Table II and exhibit 40, a chart showing the plaintiff's technical laboratory analysis of the importations at issue with regard to the characteristics required of No. 5 fuel.

■ In this connection it is basic that a long established practice by the Bureau of Customs, the agency entrusted with the administration of the tariff laws, will be given great weight in the interpretation of those laws. See for example Mattel, Inc. v. United States, 65 Cust.Ct. 616, C.D. 4147 (1970); United States v. W. N. Proctor & Co., 145 F. 126 (1 Cir. 1906); United States v. Electrolux Corporation, 46 CCPA 143, C.A.D. 718 (1959). It appears from the evidence that the practice at the port of Philadelphia was to classify importations such as those at bar pursuant to the appropriate provision for fuel oil, and that this classification represented the established practice in these matters.

Defendant has failed to come forward with a justification for the change in customs treatment accorded the instant importation; but rather has primarily addressed itself to the contention that the provisions for fuel oils are use provisions which are not applicable to importations utilized for purposes other than fuel. Defendant cites Cities Service Oil Co. v. United States, 16 Cust.Ct. 110, C.D. 994 (1946), in which a substance described as "tar" and imported for the purpose of manufacturing asphalt was found to be unsuitable for that purpose and was used as fuel oil. The court held that it was properly classifiable as a fuel oil, agreeing with the contention of defendant that the provision for fuel oil covered only oil chiefly used as fuel, but found for the plaintiff on the ground that the disputed importation was indeed chiefly used as fuel since that was the only practical use for merchandise of its type.

■ It is our view that the decision in Cities Service Oil Co. v. United States, *supra,* must be treated as controlling only within the confines of its particular, narrow problem; viz. derivatives of liquid petroleum which by reason of unsuitability for their intended purpose are utilized as fuel. In the face of the aforementioned customs practice, which continued uninterruptedly at least until 1967, the decision in the *Cities Service* case cannot provide a basis for excluding from the provision for fuel oil such substances as are entirely suitable for use as fuel but are intended for other uses. In this context the long standing customs treatment of such importation as fuel oil is of greater moment and more controlling effect regarding the interpretation of the provisions for fuel oil. For this reason we read Cities Service Oil Co. v. United States, *supra,* as setting down a rule of inclusion for substances which might not ordinarily be used as fuel oil, not a rule of exclusion for substances which possess the characteristics of fuel oil and are suitable for use as fuel oil.

For the above reasons, we are of the opinion that weight of competent evidence herein requires a decision for the plaintiff. Accordingly, we hold that the instant importations are properly classifiable pursuant to the appropriate provisions for fuel oil. With the exception of those protests which were found to be untimely and must be dismissed, judgment will issue for the plaintiff.

MALETZ and NEWMAN, JJ., concur.