**COMMONWEALTH OIL REFINING COMPANY, INC.**

v.

**The UNITED STATES**

**The UNITED STATES**

v.

**COMMONWEALTH OIL REFINING COMPANY, INC.**

Customs Appeal No. 5488, 5489.

United States Court of Customs and Patent Appeals.

June 28, 1973.

Robert S. Stitt, Thacher, Proffitt, Prizer, Crawley & Wood, New York City, attorneys of record for Commonwealth Oil Refining Co., Inc.

Harlington Wood, Jr., Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Gilbert Lee Sandler, New York City, for the U. S.

Before MARKEY, Chief Judge, RICH, BALDWIN and LANE, Judges, and CLARK, Justice, (Ret.), sitting by designation.

LANE, Judge. .

This is an appeal and cross-appeal from the decision and judgment of the Customs Court, 67 Cust.Ct. 37, 330 F. Supp. 598, C.D. 4248 (1971), dismissing some protests and sustaining others after a consolidated trial of all the protests. The involved merchandise is described as gas oil. It was exported from Venezuela and entered at the port of Ponce, Puerto Rico, during the period 1962–1968.

No. 5488 is the appeal of the importer (hereafter referred to as Common-

wealth) from the decision of the Customs Court granting the Government's motion to dismiss some of the protests on the ground that they were filed more than sixty days after liquidation. See § 514 of the Tariff Act of 1930. Commonwealth contends that the court was in error in finding that adequate notice of liquidation had been given. We disagree and affirm the court's judgment in No. 5488.

No. 5489 is the Government appeal from the court's decision sustaining the importer's protest to the classification of the goods. For the reasons set forth below, we also affirm the court's judgment in Appeal No. 5489.

We consider the two appeals seriatim in one opinion.

## APPEAL NO. 5488—NOTICE OF LIQUIDATION

■ Where notice of liquidation has not been given in accordance with the requirements of Customs Regulations prescribed by the Secretary of the Treasury in conformance with § 505 of the Tariff Act of 1930, the liquidation is incomplete and the 60-day period specified in § 514 of the Tariff Act of 1930 does not begin to run. United States v. Astra Bentwood Furniture Co., 28 CCPA 205, C.A.D. 147 (1940). See also Commonwealth Oil Refining Co. v. United States, 67 Cust.Ct. 155, 332 F.Supp. 203, C.D. 4267 (1971). Section 16.2(d) of the Customs Regulations, 19 C.F.R. § 16.2(d), sets forth the form and manner in which notice of liquidation is to be given, and reads in pertinent part as follows:

The bulletin notice of liquidation shall be posted as soon as possible in a conspicuous place in the customhouse for the information of importers or lodged at some other suitable place in the customhouse in such a manner that it can be readily located and consulted by all interested persons, who shall be directed to that place by a notice maintained in a conspicuous place

in the customhouse stating where notices of liquidations of entries are to be found. The bulletin notice of liquidation shall be dated with the date of posting or, if not posted, with the date it is lodged in the above-described place for the information of importers.

Commonwealth contends that the requirements of notice were not satisfied in this case in essentially two particulars: (1) that the bulletin notice of liquidation was not posted in a "conspicuous" place but rather in "some other suitable place" to which there was no posted direction and (2) that the bulletin notice of liquidation was not dated with either the date of posting or lodging.

A substantial portion of the testimony and evidence adduced at trial is directed to the liquidation procedure in force in the 1963–64 period during which the merchandise involved in the dismissed protests was imported. The testimony and evidence are summarized in detail in the published opinion of the lower court.

Briefly, it appears that the gas oil in question was officially entered at Ponce, Puerto Rico, but liquidated at San Juan. The practice at San Juan included a determination of duty followed by the preparation of the bulletin notice of liquidation. With respect to those notices destined for Ponce, a clerk would assign a liquidation date some ten to fourteen days in the future and mail them to the Ponce customhouse. The notices were apparently supposed to be dated at Ponce when posted and then placed on a clipboard. There is substantial dispute as to whether the notices were dated when posted and as to the location of the clipboard in the Ponce customhouse.

The original bulletin notices relating to the specific entries involved here were not located, although other records pertaining to their liquidation were introduced in evidence. The Customs Court reviewed the record developed at trial and made several factual determinations.

The court found that the liquidating procedures used resulted in the mailing of the bulletin notices from San Juan to Ponce well in advance of the liquidation date pre-stamped on the notices and the posting of the notices on the date of liquidation. The court also determined that the date of posting was normally stamped on the notices.

As to clipboard location, the court found that the clipboard normally hung on a nail on a wall near one of the windows at which customs business was transacted, although it occasionally might have been left on a counter. Relying on Standard Oil Co. of Louisiana v. United States, 33 CCPA 152, C.A.D. 329 (1946), and finding that when hung on the wall the clipboard containing the bulletin notices was plainly visible and accessible, the court concluded that the notices were posted in a "conspicuous" place within the meaning of Customs Regulations § 16.2(d), supra.

Based on the findings made, a conclusion of compliance with the requirements of liquidation notice was reached.

### OPINION

(1) *The "conspicuous place" question*

After the Customs Court's decision, Commonwealth filed a motion requesting rehearing on the basis of testimony given by a Government witness in a different proceeding, Commonwealth Oil Refining Co. v. United States, 67 Cust.Ct. 155, 332 F.Supp. 203, C.D. 4267 (1971), bearing on the location of the clipboard in the Ponce customhouse during the relevant period. The motion was opposed by the Government, and the court denied it.

■■■ Commonwealth contends that the court below should have granted the petition for rehearing and considered the evidence Commonwealth sought to introduce. However, the Customs Court is entrusted with the exercise of its sound discretion in ruling on petitions for rehearing of the causes brought before it. See Taggesell Co. v. United States, 17 CCPA 15, 18, T.D. 43318 (1929); United States v. Shell Oil Co., 44 CCPA 54, 56, C.A.D. 637 (1957). We have not been shown that the court's ruling in the present case was manifestly erroneous, and we therefore will not disturb it. We accordingly do not consider the evidence sought to be introduced.

■■■ · We find that the determination of the Customs Court with respect to the location of the clipboard in the Ponce customhouse is supported by substantial evidence of record and is not contrary to the weight of the evidence. See United States v. F. W. Myers & Co., 45 CCPA 48, 52, C.A.D. 671 (1958). We will not disturb the findings of fact in that regard. We agree that the bulletin notices of liquidation at issue here were posted in a conspicuous place in the Ponce customhouse in accordance with the terms of § 16.2(d) of the Customs Regulations.

(2) *The "date of posting" question*

Commonwealth primarily asserts that the weight of the evidence supports the conclusion that the bulletin notices of liquidation were not "dated with the date of posting * * * " as mandated by the Customs Regulations. Commonwealth also disagrees that there is substantial evidence to support the determination of the Customs Court that the notices were posted on the date of *liquidation* and challenges a conclusion that such coincidence of dates would in any event satisfy the "date of posting" requirement of the regulation. In that regard, Commonwealth argues the following:

> There is nothing to suggest that this requirement can be satisfied by a predated date of liquidation stamped on the document before mailing [from San Juan] to the sub-port [of Ponce] for posting. To so construe the regulation would violate its plain language and would deprive an importer of an important means of safeguarding full

governmental compliance with its mandate, namely, that the notice be posted "as soon as possible" for his information.

■ We think that while such a practice might not deserve encouragement, the posting of the bulletin notice on the date of liquidation where that date is the only one appearing on the document satisfies the mandatory terms of the Regulations. In such a situation, the date of posting in fact appears on the document thus literally complying with the "date of posting" requirement. Although Commonwealth generally asserts that the practice would lead to posting at a time other than "as soon as possible," there is no supportive foundation for such an assertion. In any event, there has been no charge that the bulletin notices of liquidation were not posted "as soon as possible," and we need not attempt to construe the import of that phrase.

The critical date from the standpoint of protest filing is the date of liquidation. Posting subsequent to the date of liquidation could well give rise to actual prejudice to the importer. However, posting on or before that date would not be prejudicial. The pre-dating procedure used in San Juan was structured to avoid posting subsequent to liquidation. We conclude that pre-dating complies literally with the constructive notice provision of the Customs Regulations and is not inconsistent with the spirit of that provision.

■ Commonwealth has not directed our attention to evidence tending to prove that the notices here involved were not posted on the date of liquidation, as found by the Customs Court, and we have found no such evidence. It is presumed that public officials perform their duties in a manner consistent with law, see Olavarria & Co. v. United States, 47 CCPA 65, 66, C.A.D. 729 (1960), and under our construction of § 16.2(d), the posting of pre-dated notices on the date of liquidation is such a manner. We agree with the Government that Commonwealth has failed to rebut the presumption. We also think there is substantial evidence of record which supports the determination of the Customs Court that the notices were posted on the date of liquidation.

### Conclusion

We are not persuaded of error in the Customs Court's holding that notice of liquidation was given in accordance with the conditions of § 16.2(d) of the Customs Regulations. Notice having been properly given, and protest not having been timely made with respect to the entries enumerated in the lower court's published opinion, dismissal of those protests was proper. We accordingly *affirm* the judgment of the Customs Court in Appeal No. 5488.

### APPEAL NO. 5489—CLASSIFICATION OF THE MERCHANDISE

The merchandise consists of gas oil which is a petroleum distillate separated from the crude oil in the initial stage of the refining process. The gas oil was imported from Venezuela and then further refined at Commonwealth's plant at Guaynilla Bay, Puerto Rico, to produce gasoline.

Since the entries involved in the consolidated protests spanned a period during which the tariff laws were changed, there are separate provisions for gas oil imported up to August 30, 1963, and that imported after that date. In either case, the essence of the dispute arises out of classification of the imported gas oil by customs officials at Puerto Rico as a liquid derivative of crude petroleum whereas Commonwealth claims that it should be classified as fuel oil.

The Customs Court agreed with Commonwealth that gas oil similar to that here imported had long been classified as fuel oil by the Bureau of Customs and concluded that a construction of "fuel oil" as used in the relevant statutory provisions which encompasses Venezuelan gas oil is, by virtue of the long established administrative practice, con-

trolling. The Government seeks reversal of the decision of the Customs Court sustaining the timely filed protests contending that to be classified as fuel oil, the imported gas oil would have to be chiefly used as fuel oil which, in fact, it is not. On appeal, Commonwealth urges that the court below correctly found the existence of a uniform and consistent administrative practice and contends that such practice extended from as early as 1922 to at least 1967 with the exception of the action of the customs officials responsible for classification of the goods here involved. The Government is of the view that no such practice has been proved and that in any event such practice, even if found to exist, should not override the plain meaning of "fuel oil" as oil chiefly used in its imported state as fuel.

### The Statutory Provisions

The evolution of the statutory provisions at issue is relevant to our inquiry. Paragraph 1733 of the Tariff Act of 1930, which was similar in all material respects to paragraph 1633 of the Tariff Act of 1922, provided free entry of petroleum products. The imported goods were classified under paragraph 1733 of the 1930 Act, and that classification is not disputed. The provision reads as follows:

Oils, mineral: Petroleum, crude, fuel, or refined, and all distillates obtained from petroleum, including kerosene, bezine, naphtha, gasoline, paraffin, and paraffin oil, not specially provided for.

Therefore, from at least the effective date of the 1922 Act, gas oil was unquestionably entitled to free entry whether considered a fuel oil or simply a distillate of petroleum. However, duty was imposed by virtue of the Internal Revenue Code of 1939, § 3422 of which reads as follows:

Crude petroleum, ½ cent per gallon; fuel oil derived from petroleum, gas oil derived from petroleum, and all liquid derivatives of crude petrole-

um, except lubricating oil and gasoline or other motor fuel, ½ cent per gallon.

As can be seen, § 3422 expressly provided for "gas oil derived from petroleum." Under the Venezuelan Trade Agreement of 1939, T.D. 50015, § 3422 of the I.R.C. was modified to reduce the rate of duty to ¼¢ per gallon on:

Crude petroleum, topped crude petroleum, and fuel oil derived from petroleum including fuel oil known as gas oil.

In a published letter from W. R. Johnson, Commissioner of Customs, to the collector at New York dated December 16, 1939, 75 Treas.Dec. 248, T.D. 50060, the following was said concerning the Venezuelan Trade Agreement, T.D. 50015:

* * * prior to the enactment of the Revenue Act of 1932, certain specifications were developed and approved by various industries and were promulgated and issued by the Department of Commerce in 1929 as Commercial Standards CS12–29. Oil which meets these specifications and is known as fuel oil or gas oil, should be regarded as within the description in item 3422 * * *.

By Presidential Proclamation of 1952, T.D. 53107, the Venezuelan Trade Agreement of 1939 was supplemented so that 3422 of the I.R.C. was written in the form which governs the duty to be imposed on those goods here imported up to August 30, 1963. The provisions read as follows:

[Claimed as]
Crude petroleum, topped crude petroleum, and fuel oil derived from petroleum (including fuel oil known as gas oil):
Testing under 25 degrees A.P.I. .... ⅛¢ per gal.
[Classified as]
Liquid derivatives of crude petroleum
* * * ...................... ¼¢ per gal.

Included in the Treasury Decision publication of T.D. 53107 is a letter "To Collectors of Customs and Others Concerned," written by Frank Dow, Com-

missioner of Customs, 87 Treas.Dec. 283 (1952), which states:

You will note that, by virtue of these proclamations, the tariff-rate quota on crude petroleum, fuel oil, gas oil, and topped crude petroleum will be removed, and the import tax assessable under section 3422, Internal Revenue Code, will be reduced from $\frac{1}{4}$ cent to $\frac{1}{8}$ cent per gallon on these products testing under 25 degrees A. P.I. * * *.

The Tariff Schedules enacted pursuant to the Customs Simplification Act of 1954 apply to the gas oil here imported subsequent to August 30, 1963. The relevant provisions are as follows:

[Classified as]
Mixtures of hydrocarbons not specially provided for, derived wholly from petroleum, shale, oil, natural gas, or combinations thereof, which contain by weight not over 50 percent of any single hydrocarbon compound:
475.65 In liquid form .......... [$\frac{1}{4}$¢ per gal.]

[Claimed as]
Crude petroleum (including reconstituted crude petroleum); topped crude petroleum; crude shale oil; and distillate and residual fuel oils (including blended fuel oils) derived from petroleum, shale, or both, with or without additives.
475.05 Testing under 25 degrees A.P.I. ...................... [$\frac{1}{8}$¢ per gal.]

Although as compared to § 3422 of I.R. C., as modified by T.D. 53107, TSUS item 475.05 makes no mention of "fuel oil * * * (including fuel oil known as gas oil)," and refers to "distillate and residual fuel oils," the Government does not advance any contention to the effect that the TSUS perfected a change in the treatment of gas oil such as that here involved. The Government's position is that the imported gas oil is not classifiable as a fuel oil in either case.

### The Nature of the Gas Oil

Sam Zamudio, a chemical engineer by degree and technical adviser to the vice president of Commonwealth responsible for refining and petrochemicals, was called by Commonwealth and testified as to the nature of gas oil. Zamudio characterized gas oil as "in essence, part of crude oil * * * derived [in fact]

from the very first distillation step of crude oil." He noted that the gas oil is a distilled fraction which has been separated from the crude, but unchanged. Direct examination of Zamudio including the following:

Q. Now, will this gas oil we have been talking about burn? A. Yes, it would burn like every other hydro-carbon.

Q. And will it produce heat and power? A. Yes. The gas oil ranges will burn without any particular difficulty. They normally produce about 18,500 BTU's to the bound [sic: pound?] of heat release.

Q. Could the gas oil be marketed in its imported form?

* * * * * *

* * * A. Well, yes, the gas oil, as such, could be marketed in its imported form, and it would be marketed under the regulations of No. 5 fuel oil.

Q. Now, is such gas oil, in fact marketed in imported form? A. No, because from a practical point of view all refineries are in the process of generating optimum profits or at least this is what we all strive for. Any gas oil, as such, must be processed further to optimize on profitability. Marketing gas oil in its raw form, as such, would be a loss of money.

Q. Now, how is gas oil, again speaking generally within the industry, further refined? A. Earlier, when I was telling you about the virgin and cracked fractions—a virgin fraction such as gas oil would be processed by any one of two means, either thermal decomposition or catalytic decomposition. In our plant, we don't have any thermal crackers for gas oil but we do have catalytic crackers. So, therefore, the gas oil is processed through a catalytic cracker down to fractions, similar to those of crude oil, gas, gasolines, naphthas, and cycle oils.

Q. How long has it been industry practice to further refine a crack gas

oil? A. Well, this has started from what I would call day 1. The day somebody took oil out of the ground it really wasn't very good in its physical form, but boiling it off and taking off the light ends, and throwing away the heavy residuals did produce distillates used for heating oil, lamps, early gasoline engines, and that sort of thing. So, this really starts from the day that the industry got going.

One of the exhibits received in evidence (Exhibit 32), a publication of the Commerce Department which discusses fuel oils, describes "No. 5" fuel oil as "Residual-type oil for burner installations equipped with preheating facilities." It defines the minimum flash point, maximum water and sediment content, maximum ash content, and viscosity ranges of No. 5 fuel oil. The record includes other source material concerning the nature of No. 5 fuel oil.

The Customs Court stated as follows:

Mr. Zamudio's testimony was clear in its assertion that the importations could be marketed in their imported form as No. 5 fuel oil. The court has examined a multitude of source materials placed in evidence for the purpose of clarifying the nature of fuel oils and their identifying characteristics. [Footnote omitted.] The court has also examined the customs laboratory report cards relating to the importations. Concerning these, the parties stipulated that "[n]otwithstanding the statements on the various customs laboratory report cards that the samples did not conform to ASTM (American Society for Testing Materials) or other specifications for fuel oil, the only tests conducted of the plaintiff's gas oil importations were those specifically enumerated on the cards themselves, namely API gravity, viscosity and, in some cases, sediment and water." The important tests for flash point and ash contents were not performed. Thus the laboratory reports, as far as they went, are consistent with a finding that the importations possessed the characteristics of No. 5 fuel oil,

while the positive testimony of Mr. Zamudio—unrebutted and uncontradicted—serves to establish the fact that the imported gas oil did indeed possess the characteristics of No. 5 fuel oil.

■ We think that there is substantial evidence to support the trial court's determination that the imported gas oil "possessed the characteristics of No. 5 fuel oil." However, there is no assertion by Commonwealth that the goods are in fact used as fuel oil, and the indication is that use as fuel oil is commercially impractical. The evidence tends to prove that the importations were in fact further refined. We conclude that the imported gas oil possesses the characteristics of No. 5 fuel oil. However, we also conclude that it is not chiefly used as such and that it would not be economically feasible to use the gas oil as imported for fuel oil.

### The Customs Court

In addition to evidence concerning the nature of the gas oil, Commonwealth introduced testimony and documentary evidence allegedly demonstrating administrative practice and legislative intent with respect to the statutory provisions relevant to this appeal. Commonwealth took the depositions of several customs officials of the port of Philadelphia—Edward Henry, district director, Arthur Grill, chief chemist, and Frederick Pantella, lead import specialist. Some 14 entries of gas oil made at Philadelphia during the period 1961–1968 were brought into evidence. Those entries were found by the customs laboratory to have the characteristics of No. 5 fuel oil and were classified as fuel oil.

The Customs Court, in its opinion, relied upon the testimony of the Philadelphia customs officials in finding the existence of long-standing, established practice at that port with respect to the classification of Venezuelan gas oil having the characteristics of No. 5 fuel oil. The court found, as indicated above, that the imported gas oil likewise "meets commercial specifications for No.

5 fuel oil." It accordingly held the imported merchandise to fall within the scope of the established practice. Specifically, the Customs Court reasoned as follows:

> The testimony of the Philadelphia customs officials establishes that Philadelphia is a leading port for importations of petroleum. * * *

> The evidence herein further shows that the importations in question possess the characteristics of No. 5 fuel oil and as such are similar to the importations which were classified at the port of Philadelphia as fuel oil until 1967. * * * [W]e conclude that this [merchandise] is similar to Venezuelan gas oil which was entered at the port of Philadelphia.

> In this connection it is basic that a long established practice by the Bureau of Customs, the agency entrusted with the administration of the tariff laws, will be given great weight in the interpretation of those laws. [Citations omitted.] It appears from the evidence that the practice at the port of Philadelphia was to classify importations such as those at bar pursuant to the appropriate provision for fuel oil, and that this classification represented the established practice in these matters.

> Defendant has failed to come forward with a justification for the change in customs treatment accorded the instant importation[s]; but rather has primarily addressed itself to the contention that the provisions for fuel oils are [use] provisions which are not applicable to importations utilized for purposes other than fuel.

The court gave controlling effect to the "customs practice, which continued uninterruptedly at least until 1967," of classifying gas oil having the characteristics of No. 5 fuel oil, and therefore suitable for such use, pursuant to the provisions for fuel oil. The court held the "weight of competent evidence" to require a judgment sustaining Commonwealth's protests.

### Is Long-Standing, Established Administrative Practice An Issue Relevant to This Appeal?

The Government contends that there is insufficient evidence upon which to conclude that established administrative practice existed. However, the Government more fundamentally assails consideration of such practice as inappropriate where, as allegedly here, there is no ambiguity in the statutory provisions. The Government contends that the fuel oil provisions before us are plainly "use" provisions, that the Customs Court so held with respect to I.R.C. § 3422 in Cities Service Oil Co. v. United States, 16 Cust.Ct. 110, C.D. 994 (1946), and that to fall within the classification of a "use" provision, merchandise must be chiefly used according to that "use." The relevance of the consideration integral to the trial court's decision is therefore the threshold legal issue.

Long-established administrative practice has several conceptual connotations. Section 315(d) of the Tariff Act of 1930, codified as 19 U.S.C. § 1315(d), provides that:

> No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall not apply with respect to the imposition of anti-dumping duties.

In Asiatic Petroleum Corp. v. United Sates, 59 CCPA 20, 440 F.2d 1309, C.A.D. 1029 (1971), this court held a reference to "an established and uniform practice" in a letter written by the Acting Commissioner of Customs to the collector of customs at New York to constitute a "finding" of such a practice by the delegate of the Secretary of the

Treasury within the meaning of § 315(d). Customs could effect a change in that practice only by following procedures consistent with § 315(d) which include publishing notice of such change.

There is no assertion in the present case that a "finding" of "an established and uniform practice" with respect to Venezuelan gas oil has ever been made by the Secretary of the Treasury or his representative. We are therefore not here concerned with established practice in the statutory sense, a change in which requires due notice as prescribed.

■ Long-established administrative practice may bear on the construction of the tariff laws as noted by the Customs Court. See United States v. Fred Whitaker Co., 40 CCPA 19, 29, C.A.D. 492 (1952); United States v. Electrolux Corp., 46 CCPA 143, C.A.D. 718 (1959). However, this court has recognized such practice to be comparable to other extrinsic aids to ascertaining legislative intent which come into play when the construction of a statutory provision is in doubt. See Armand Schwab & Co. v. United States, 32 CCPA 129, 133, C.A.D. 296 (1945); United States v. C. I. Penn, 27 CCPA 242, 245–246, C.A.D. 93 (1940). Indeed, in C. J. Tower & Sons v. United States, 44 CCPA 41, 44, C.A. D. 634 (1957), the court expressed agreement with the proposition that an administrative practice prejudicial to the importer shown to be clearly erroneous would be reversible despite its age. In C. J. Tower, the court also recognized the reenactment of an ambiguous statute without substantive change to have incorporated the administrative construction where that construction had been followed consistently for a long time. See also United States v. Edward I. Petow & Son, 34 CCPA 55, 64, C.A.D. 343 (1946).

In the present case, the importer alleges a forty-five year period up to 1967 of consistent and uniform classification of Venezuelan gas oil as fuel oil. If in fact there has been an established prac-

tice of that tenure surviving the various tariff legislation enacted during that period, an interpretation of "fuel oil" in the provisions in issue consistent with that practice may be strongly suggested. Compare Electrolux, supra, 46 CCPA at 146; United States v. H. Bayersdorfer & Co., 16 Ct.Cust.Appls. 43, 46, T.D. 42717 (1928).

■ We do not think the court below erred in looking to the evidence of established practice. The tax provision which Commonwealth claims to be the proper classification expressly includes within the term "fuel oil," "fuel oil known as gas oil." The Government apparently is of the view that the gas oil must first be chiefly used as fuel oil to be a fuel oil known as gas oil. However, an interpretation that brings gas oil having the characteristics of fuel oil within that phrase is a reasonable alternative. In light of the statutory evolution, the TSUS provision which does not expressly include "fuel oil known as gas oil," but which does newly refer to "distillate and residual" fuel oils, is likewise amenable to several reasonable constructions. Under the circumstances, we conclude that the statutory provisons at issue are ambiguous as to the intended scope and meaning of the term "fuel oil." Resort to extrinsic aids in ascertaining the legislative intent is therefore warranted in this case.

The Government advances the *Cities Service* case, supra, as a judicial construction of the fuel oil provision of I. R.C. § 3422. In *Cities Service* the importer claimed that the merchandise, which was invoiced as "tar" was properly classifiable and taxable as fuel oil. The Government contended that the tar had to be chiefly used as fuel oil to be so classified. The Customs Court there agreed with the Government, but found that in fact the tar was chiefly used as fuel oil. The Customs Court here regarded *Cities Service* as merely including the tar at issue before the court within the fuel oil provision and not as

excluding all substances which might not be chiefly used as fuel oil. We agree with that analysis. Since the goods in *Cities Service* were found to be chiefly used as fuel oil, the court's concession to the Government position was not essential to the decision. The court did not have to carefully weigh the merits for and against characterization of the fuel oil provision as a "use" provision as a prerequisite to rendering a dispositive decision. Moreover, the considerations relevant to a determination of whether or not "tar" is fuel oil did not include evaluation of the phrase "fuel oil * * * including fuel oil known as gas oil." *Cities Service* is not a judicial construction of the provisions here involved which persuades us of a legislative intent regarding the tariff and tax treatment of gas oil having the characteristics of No. 5 fuel oil.

In sum, we think that the evidence of legislative intent offered by Commonwealth is relevant to the issues before us, and we proceed to a review of that evidence.

### The Practice at Philadelphia

As noted above, the customs officials Henry, Grill and Pantella testified and evidence of entries made between 1961 and 1968 was introduced. The Customs Court appears to have relied principally on the evidence bearing on the practice at Philadelphia. However, the Government advances several basic contentions with which we agree.

While the testimony of the deponents does establish that Philadelphia is a leading port of entry for petroleum, it also indicates that it is a minor port of *gas oil* entry. On cross-examination, in 1968, Grill stated:

> The Port of Philadelphia has imported within the last eight years approximately only a dozen cargoes of gas oil, which is a minor proportion of that imported throughout the rest of the country.

Pantella, on cross-examination, characterized the volume of gas oil importation relative to that of other petroleum products at Philadelphia as "small." By contrast, the entries involved in this appeal, made at Ponce, Puerto Rico, during the period 1962–1968, numbered in excess of 50. We think the assumption that the experience at Philadelphia is such that the view of its customs officials regarding classification of gas oil is more credible than that of customs officials at other ports lacks evidentiary basis.

We also agree with the Government that the inquiry relevant to long-established administrative practice should not be one which weighs the merits of the practice at one port against the merits of the practice at another port occuring approximately contemporaneously. We hold that the evidence of the classification practice employed at Philadelphia during the period 1961–1968 is insufficient to prove established administrative practice.

As to the period prior to 1961, we are directed to no specific evidence of entries of gas oil at Philadelphia and their classification. Commonwealth relies on the testimony of Pantella wherein the witness agreed that under the various tariff and tax acts commencing with the Act of 1922, gas oil would have been classified in the same paragraph as fuel oil. The Customs Court made general reference to Pantella's testimony. However, our review of Pantella's deposition fails to reveal any substantial basis for concluding that in fact there had been shipments of gas oil prior to 1961 received at Philadelphia and that there had in fact been a practice of classifying such gas oil as fuel oil. The tenor of Pantella's testimony is that he assumed that gas oil would have been so classified and that he was aware of no shipments which had been classified otherwise. Pantella himself began working for the Bureau of Customs in 1962.

We think that Commonwealth has failed to come forth with affirmative,

convincing evidence of the existence of a long-established practice at Philadelphia. Lacking substantial evidence in the record, the finding of the Customs Court in this regard cannot be sustained.

### Commonwealth's Overall Case for Legislative Intent to Classify Gas Oil as Fuel Oil

Our conclusions respecting the alleged established practice at Philadelphia to some extent undermine the rationale of the Customs Court as expressed in its opinion. However, Commonwealth's overall case for legislative intent with regard to gas oil is broader and includes other evidence which was before the court below. We feel that the overall case presented by Commonwealth is convincing.

Commonwealth's Exhibit 2 is a copy of a portion of the Summaries of Tariff Information, prepared in 1948 by the Tariff Commission. The copied portion discussed the tariff rate applied to "Distillate fuel oil (including gas oil)" under the various tariff and tax laws commencing with the 1922 Tariff Act. It notes that "[i]n the trade agreement with Venezuela [discussed supra] the excise tax on imports of crude petroleum, topped crude, fuel oil, and gas oil was reduced * * *."

Exhibit 34 is a copy of a portion of Schedule A of the Statistical Classification of Commodities Imported into the United States published in 1950 by the Department of Commerce. The document refers to the classification of "Gas oil (including Diesel oil) and finished distillate fuel oil." This classification was distinguished from that for "Unfinished oils for futher processing, including topped crude."

The letters of Commissioners Johnson and Dow, T.D. 50060 and T.D. 53107, have been discussed above in connection with the evolution of the statutory provisions. They were introduced as Commonwealth's Exhibits 33 and 5, respectively. The Johnson letter made refer-ence to Commercial Standards CS12–29, published in 1929, as disclosing certain standards. Collectors were advised that oil "known as fuel oil or gas oil" which met those standards was to be classified under the fuel oil provision. Exhibit 32 is a copy of Commercial Standard CS12–48, the 1948 revision of 1929 standards. That publication has been discussed supra in connection with the consideration of the nature of the gas oil and the finding that there was substantial evidence to support the trial court's determination that the imported gas oil possesses the characteristics of No. 5 fuel oil.

The totality of the evidence lends substantial support to a conclusion that the executive departments considered gas oil possessing the characteristics of fuel oil to be properly classified and assessed with duty at the same rate as fuel oil irrespective of the particular importation's actual or chief use. The Bureau of Customs assumed and directed such classification, and there is no evidence tending to indicate that classification in that manner ,was not observed. The case for a long-standing administrative *construction* of the relevant fuel oil provisions as encompassing gas oil appears to us to be strong.

We stress that the language of the statutory provisions is plainly amenable to that construction. "Fuel oil known as gas oil" is a phrase which on its face could well include gas oil having the characteristics of fuel oil. As we attempt to assess the correctness of the interpretation placed upon it by the Customs Court, we are moved by the weight of the evidence to agree that the various statutory provisions were, and should be, interpreted according to that construction. In the absence of evidence, or even argument, which might persuade us to consider that in adopting the TSUS the Congress sought to modify the scope of the I.R.C provision for fuel oil, we are not disposed to assume such an intent. We accordingly find that the con-

**1364**

struction given the I.R.C. provision applies as well to the TSUS item.

The Government has failed to offer any convincing rebuttal to the evidence we have mentioned. At oral argument, Government counsel referred to the Commissioners' letters and the Summaries as very "general." We think their import is clear and that, in fact, they are quite specific. We have no doubt that the Commissioners and the Tariff Commission as then constituted would have regarded the present importations to be properly classified as fuel oil or "fuel oil known as gas oil."

At oral argument there was some discussion of the ability of the Bureau of Customs to change its mind with respect to classification. As noted above, the Bureau can make administrative rulings and change rulings within the scope of its authority by following due procedures. Commonwealth has argued that only the Congress can now change the classification of gas oil. We agree not because we would agree with a proposition that an agency can be frozen into one interpretation, but rather because we have considered the contemporaneous construction of certain Acts of Congress in ascertaining the proper meaning of language contained in those acts. We have to our satisfaction determined the intent of Congress with respect to ambiguous language.

We conclude that the Customs Court correctly interpreted the relevant statutory provisions as providing for the classification of the imported gas oil as fuel oil. The decision and the judgment of the Customs Court in No. 5489 is accordingly affirmed.

### SUMMARY

The judgment of the Customs Court in Appeal No. 5488 is affirmed. The judgment of the Customs Court in Appeal No. 5489 is affirmed.