**VIVITAR CORPORATION, Plaintiff,**

**v.**

**The UNITED STATES, et al., Defendants,**

**and**

**47th Street Photo, Inc., Defendant-Intervenor.**

**Court No. 84–1–00067.**

United States Court of International Trade.

Aug. 20, 1984.

**422**

Stein, Shostak, Shostak & O'Hara, Steven P. Kersner, Irwin P. Altschuler and Donald S. Stein, R. Kenton Musgrave, Wiley, Johnson & Rein, James M. Johnstone, Thomas W. Kirby and Dwight G. Rabuse, Washington, D.C., for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Lit. Branch, Washington, D.C., and Velta A. Melnbrencis, New York City, for defendants.

Miller, Cassidy, Larroca & Lewin, Nathan Lewin, Jamie S. Gorelick, James L. Volling and Rory K. Little, Washington, D.C., Groman & Wolf, Marvin H. Wolf, Mineola, N.Y., for intervenor.

Covington & Burling, William H. Allen, Eugene A. Ludwig, Scott D. Gilbert and Daniel A. Rowley, Washington, D.C., for amici curiae Coalition to Preserve the Integrity of American Trademarks, et al.

James C. Tuttle and Deborah L. Miela, Troy, Mich., Steele, Simmons & Fornaciari, Robert W. Steele and Robert E. Hebda, Howrey & Simon, John F. Bruce, Kevin P. O'Rourke, Catherine Shea, Washington, D.C., for amicus curiae K mart Corp.

Bass, Ullman & Lustigman, New York City (Robert Ullman, Sandler & Travis, New York City, of counsel), for amicus curiae American Free Trade Ass'n.

Olwine, Connelly, Chase, O'Donnell & Weyher, William F. Sondericker, New York City, for amicus curiae Progress Trading Co., Inc.

Kelly, Lucas & Mohen, Richard B. Kelly and Thomas P. Mohen, New York City, for amicus curiae Nat. Ass'n of Catalog Showroom Merchandisers.

*Memorandum Opinion and Order*

RESTANI, Judge.

### Background

In this action plaintiff seeks a declaratory judgment that the United States Customs Service must exclude all imports bearing plaintiff's trademark that are entered without the written consent of plaintiff.[1] Plaintiff contends that 19 U.S.C. § 1526(a) (1982) gives it an unqualified right to demand such exclusion.[2]

Plaintiff is a California corporation and the owner of the Vivitar trademark in the United States. Plaintiff licenses foreign manufacturers to apply the Vivitar trademark to a variety of photographic equipment. Plaintiff's wholly owned subsidiaries market this equipment outside of the United States. Apparently these subsidi-

---

**1.** Plaintiff's complaint seeks relief in the nature of mandamus. In a later filing, plaintiff conceded that declaratory relief would be adequate. Therefore, the court will treat plaintiff's action as one for declaratory or injunctive relief.

**2.** 19 U.S.C. § 1526(a) provides:

Except as provided in subsection (d) of this section, it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of,

or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States, under the provisions of sections 81 to 109 of title 15, and if a copy of the certificate of registration of such trademark is filed with the Secretary of the Treasury, in the manner provided in section 106 of said title 15, unless written consent of the owner of such trademark is produced at the time of making entry.

aries are not licensed to market these goods in the United States. The parties agree that third parties unrelated to plaintiff are importing into the United States equipment bearing the Vivitar trademark, which equipment was manufactured by the foreign licensees. The parties also agree that plaintiff has not given its written consent to these particular imports.

The unauthorized importation of genuine trademarked goods is a widespread practice. Apparently a number of American trademark owners authorize foreign companies to apply the American-owned trademark to goods manufactured abroad. Often the foreign companies are authorized to market the trademarked goods abroad, but are not authorized to import the goods into the United States except through channels approved by the trademark owner. Due to a variety of market conditions there are often substantial price differences between the price the foreign companies charge abroad and the price in the United States. When the United States price is substantially higher than the foreign price, importers can profitably buy large quantities of the trademarked goods overseas, import them to the United States, and sell them to distributors and retailers at a discount. American companies such as intervenor 47th Street Photo, Inc. and *amicus curiae* K mart Corporation, see 585 F.Supp. 1415, purchase large quantities of these imports and offer them for sale at prices often far below those of retailers selling goods the American trademark owner has authorized

for importation. However, since these goods are sold outside of the trademark owner's intended chain of distribution, they frequently have different warranties and packaging from that intended by the trademark owner. This pattern of unauthorized importation is part of what is known as the gray market.

The Customs Service does not prohibit gray market imports as described above. The Customs Service interprets § 1526(a) to deny trademark owners the right to require the exclusion of trademarked goods manufactured abroad when the trademark owner has authorized the foreign manufacturer to apply the trademark to the goods. 19 C.F.R. § 133.21 (1983).[3] Plaintiff contends that the Customs Service's interpretation of § 1526(a) is contrary to law. This matter is before the court on plaintiff's and defendants' cross-motions for summary judgment.[4]

## Exhaustion of Administrative Remedies

■ Initially, *amicus curiae* K mart contends that this action should be dismissed because plaintiff has failed to exhaust its administrative remedies. This court will, where appropriate, require the exhaustion of administrative remedies. 28 U.S.C. § 2637 (1982). Plaintiff has satisfied this requirement.

On May 14, 1982, plaintiff submitted to the Customs Service a formal request for a letter ruling that would bar commercial importation of goods bearing the Vivitar trademark unless Vivitar consented to the

---

**3.** 19 C.F.R. § 133.21 provides in relevant part:

(b) *Identical trademark.* Foreign-made articles bearing a trademark identical with one owned and recorded by a citizen of the United States or a corporation or association created or organized within the United States are subject to seizure and forfeiture as prohibited importations.

(c) *Restrictions not applicable.* The restrictions set forth in paragraphs (a) and (b) of this section do not apply to imported articles when:

(1) Both the foreign and the U.S. trademark or trade name are owned by the same person or business entity;

(2) The foreign and domestic trademark or trade name owners are parent and subsidiary

companies or are otherwise subject to common ownership or control (see §§ 133.2(d) and 133.12(d));

(3) The articles of foreign manufacture bear a recorded trademark or trade name applied under authorization of the U.S. owner;

19 C.F.R. § 133.21(b), (c) only speaks to seizure and forfeiture of trademarked goods. The parties agree that the Customs Service uses the same criteria for determining whether to exclude goods bearing a registered trademark.

**4.** This court has previously determined that it has jurisdiction over plaintiff's claim. *Vivitar Corporation v. United States,* 7 CIT ——, 585 F.Supp. 1419 (1984).

importation.[5] Plaintiff supplemented this request with further information on July 15, 1982 and August 25, 1982. The Customs Service has never formally responded to this request. As K mart admits, a Customs letter ruling is agency action which is subject to judicial review. Under the circumstances of this case, failure to act on plaintiff's request for a letter ruling amounts to final agency action through withholding of relief. 5 U.S.C. § 551(10)(B), (13), § 704 (1982).[6] Plaintiff waited over eighteen months for a formal response to its request. It would be pointless and unjust to require plaintiff to await a ruling that may never be made.[7]

Moreover, the issue before the court is purely one of the validity of the administrative interpretation of a statute. There is no problem with identifying the pertinent facts contained in the administrative and legislative history. Thus, little would be gained by awaiting a possible response to plaintiff's request for a letter ruling. *See National Automatic Laundry and Cleaning Council v. Schultz*, 443 F.2d 689, 695 (D.C.Cir.1971).

K mart apparently contends that the present action is not presented properly as an appeal from the Customs Service's failure to act, since plaintiff's initial action was presented in the form of a mandamus action. This contention is meritless. Plaintiff's complaint is not limited to requesting mandamus relief. And in any case, since plaintiff has satisfied the requirement of exhaustion of administrative remedies, it is irrelevant how its action for judicial review is labeled.

### Lack of Material Factual Disputes

Intervenor opposes plaintiff's motion for summary judgment on the grounds that material issues of fact exist requiring a trial. " 'In ruling on cross-motions for summary judgment, the court must determine if there exist any genuine issues of material fact.' " *PPG Industries, Inc. v. United States*, 7 CIT ——, Slip Op. 84–27 at 3 (March 28, 1984) (citing *American Motorists Insurance Co. v. United States*, 5 CIT ——, Slip Op. 83–8 (February 1, 1983)). The court can only grant summary judgment if no material issues of fact are in dispute. Intervenor contends that a trial is necessary to determine plaintiff's corporate structure. Intervenor argues that this is needed to ascertain the proper application of the Customs Service's administrative practice to imports bearing plaintiff's trademark. Intervenor also contends that a trial is needed to determine the Customs Service's historic administrative practice concerning unauthorized importation of goods bearing genuine trademarks. Intervenor contends further that there is a factual dispute over whether plaintiff consents to the importation of all goods sold overseas by its subsidiaries, and whether plaintiff is harmed by this importation.[8]

■ Intervenor is correct in noting that plaintiff's relationship with its overseas manufacturers and subsidiaries is material. *See* 19 C.F.R. § 133.21(c) (footnote 3, *supra*). But no material facts concerning this relationship are in dispute. Plaintiff

---

**5.** Letter rulings are authorized by 19 C.F.R. § 177.1 *et seq.* (1983). They represent the official position of the Customs Service until modified or revoked. 19 C.F.R. § 177.9.

**6.** It should be noted that the instant case arises under 28 U.S.C. § 1581(i). The court expresses no opinion as to the appropriate circumstances for judicial review of requests for letter rulings that may be eventually reviewable pursuant to 28 U.S.C. § 1581(h).

**7.** The Customs Service is engaged in an ongoing inquiry into gray market trade practices. 49 Fed.Reg. 21453 (1984). There is no indication that this inquiry will lead to agency action re-

sponding to plaintiff's request. And regardless, the Customs Service will not issue a letter ruling involving any issue while the issue is being litigated before this court. 19 C.F.R. § 177.7.

**8.** Intervenor also contends that a number of plaintiff's factual allegations should not be considered due to the absence of certified copies of supporting documents. Court of International Trade Rule 56(f). The court declines to require full technical compliance with Rule 56(f) because the documents referred to by intervenor either support undisputed facts (plaintiff's ownership of the Vivitar trademark in America) or nonmaterial facts. *See* Rule 1 of this court.

admits that its overseas distributors are wholly owned subsidiaries and that it consents to overseas manufacturers' applying the Vivitar trademark to goods sold overseas. Thus, plaintiff admits all the material facts necessary to application of current Customs Service policy. What plaintiff contests is the legality of that policy.

■ Intervenor is also correct in noting that the Customs Service's historic administrative practice is relevant to determining the proper application of § 1526(a). *See Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 311, 53 S.Ct. 350, 357, 77 L.Ed. 796 (1933). But again no trial is necessary concerning this issue. All parties and *amici curiae* have submitted substantial material documenting the administrative history of § 1526(a). No party has challenged the authenticity of the material submitted. The court may take judicial notice of the material submitted and of material reviewed in its independent legal research into the history of § 1526(a). These are legislative facts of general application, not specific to the parties, which the court may freely notice. *See* Fed.R.Evid. 201(a), Notes of Advisory Committee; *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330, 336 (5th Cir.1978); *Association of National Advertisers, Inc. v. Federal Trade Commission,* 627 F.2d 1151, 1161–1163 (D.C.Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).

■ Intervenor's contention that plaintiff impliedly consents to the importation of goods bearing its trademark also does not require trial. Intervenor has not contended that plaintiff has consented in writing to the entries it now wishes to control. Such a contention would be a material factual dispute. *See* 19 U.S.C. § 1526(a). Instead intervenor contends that facts admitted by the plaintiff concerning its structure and licensing arrangements require the court to imply as a matter of law that plaintiff consents to importation of all goods manufactured by its licensees bearing its trademark. This contention is disputed by the parties, but it does not require a trial since it is a legal issue, and all the material facts concerning the issue are undisputed.

■ Finally, plaintiff's contention that it is commercially injured in various ways by unauthorized imports is not material to plaintiff's action under § 1526(a). The statute does not require any trademark owner to demonstrate actual commercial injury. Thus, the fact that intervenor disputes this contention is irrelevant.[9]

Therefore, the court concludes that there are no material issues of fact requiring trial and that this case is appropriate for summary disposition.

### History of § 1526(a)

The central issue in this case is the proper construction of § 1526(a). Plaintiff contends that the plain language of the statute gives it the right to require the exclusion of all goods bearing the Vivitar trademark. Plaintiff further contends that this construction is supported by the legislative and administrative history of the statute. Defendant and intervenor concede that the literal language of § 1526(a) supports plaintiff's construction. But they contend that the legislative history demonstrates that Congress intended a much narrower scope than that which is evident in the literal words of § 1526(a), and that this construction is supported by the Customs Service's longstanding administrative practice and Congressional ratification.

The principle purpose of statutory construction is to determine and give effect to Congressional intent. *United States v. Siemens America, Inc.,* 68 CCPA 62, 68, 653 F.2d 471 (1981), *cert. denied,* 454 U.S. 1150, 102 S.Ct. 1016, 71 L.Ed.2d 304 (1982). To determine Congressional intent, the court must look to the language of the statute. *Id.* But statutory language cannot control if clearly demonstrated Congressional intent requires a different construction. *Bob Jones University v. United States,* 461

---

**9.** Plaintiff's standing to bring this action is not challenged. It alleges a legal injury stemming from adverse agency action. *See* 28 U.S.C. § 2631(i).

U.S. 574, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983); *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). Legislative history is important evidence of Congressional intent. *British Steel Corporation v. United States*, 6 CIT ——, 573 F.Supp. 1145, 1148 (1983). And in construing a statute, the administrative practice of the agency charged with administering the statute is entitled to substantial deference. *Zenith Radio Corporation v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924 (Fed.Cir.1984). Therefore, a careful examination of the legislative and administrative history is essential in determining the intended scope of § 1526(a).

Congress first restricted importation of merchandise bearing trademarks in 1871. 16 Stat. 580 (1871). This act and a number of subsequent acts restricted importation of merchandise bearing a trademark that "copied or simulated" a domestic trademark. These restrictions were put in their current form by the Trademark Act of 1905, Pub.L. No. 58–84, 33 Stat. 724 (1905). Section 27 of the act (Now 15 U.S.C. § 1124 (1982)) provides in relevant part that "no article of imported merchandise ... which shall copy or simulate a trade-mark registered in accordance with the provisions of this Act ... shall be admitted to entry...."

After enactment of this section, a pair of Second Circuit cases tested the meaning of the term "copy or simulate." *Fred Gretsch Mfg. Co. v. Schoening*, 238 F. 780 (2d Cir.1916); *A. Bourjois & Co., Inc. v. Katzel*, 275 F. 539 (2d Cir.1921), *rev'd*, 260 U.S. 689 (1923). In the *Gretsch* case, a German company manufactured violin strings under the trademark "Eternelle." Schoening had an exclusive agency for the sale of "Eternelle" strings in the United States and registered "Eternelle" as his trademark in the United States. Gretsch purchased "Eternelle" strings in Germany and attempted to import them. Schoening sought to bar the importation, claiming that the trademark on Gretsch's strings

copied or simulated its trademark despite the fact that the imported strings were identical to the strings Schoening marketed. In *Katzel*, a French company manufactured face powder in France and sold it in the United States under its trademark "Java". The French company sold its entire United States operation and trademark to Bourjois. Bourjois then imported the powder from France, repackaged it, and sold it under the "Java" trademark. Katzel bought the powder directly from the French manufacturer and sold it in the original French packaging. Bourjois brought suit claiming that Katzel's use of the "Java" trademark violated Bourjois' trademark rights.

In both cases, the Second Circuit held that the trademark on the challenged imports did not copy or simulate the plaintiffs' marks. The court decided that section 27 was not intended to bar imports bearing a trademark if the trademark accurately described the manufacturing source for the goods.

> There is no exclusive right to the use of a name or symbol or emblematic device except to denote the authenticity of the article with which it has become identified by association. The name has no office except to vouch for the genuineness of the thing which it distinguishes from all counterfeits; and until it is sought to be used as a false token ... the law of trade-mark cannot be invoked.

*A. Bourjois & Co. v. Katzel*, 275 F. at 541, quoting *Apollinaris Co. v. Scherer*, 27 F. 18, 20 (2d Cir.1886).

## Legislative History

Section 1526(a) was enacted in response to the Second Circuit decision in *Katzel*. As Judge Hand noted, it "was intended only to supply the casus omissus, supposed to exist in section 27 of the Act of 1905 ..., because of the decision of the Circuit Court of Appeals in *Bourjois v. Katzel*.... Had the Supreme Court reversed that decision [earlier], it would not have been enacted at all." *Coty, Inc. v. LeBlume Import Co., Inc.*, 292 F. 264, 269 (S.D.N.Y.1923), *aff'd*,

293 F. 344 (2d Cir.1923). The section was added as a floor amendment to the Tariff Act of 1922, Pub.L. No. 67–318, § 526, 42 Stat. 975 (1922). The legislative history is sparse, consisting of a short floor debate and a brief paragraph in the Conference Report. But the history makes very clear that the purpose of § 1526(a) was to reverse the Second Circuit *Katzel* decision. The Conference Report notes:

> A recent decision of the circuit court of appeals holds that existing law does not prevent the importation of merchandise bearing the same trade-mark as merchandise of the United States, if the imported merchandise is genuine and if there is no fraud upon the public. The Senate amendment makes such importation unlawful without the consent of the owner of the American trade-mark.

H.R.Rep. No. 1223, 67th Cong., 2d Sess. 158 (1922).

In the floor debates, both proponents and opponents of the section note that the purpose of the section was to give trademark owners the protection denied them by the Second Circuit. One of the section's sponsors, Senator McCumber noted "the courts have held that we cannot prevent any product being shipped into the United States if it is in violation of a trade-mark where the foreign maker has sold trade-mark and all, patent and everything in the United States." 62 Cong.Rec. 11604 (1922). Another proponent, Senator Sutherland noted that:

> [A]ll that this paragraph does is to prevent fraud, and I believe that the Senate is in favor of protecting the property rights of American citizens who have purchased trade-marks from foreigners, and when these foreigners deliberately violate the property rights of those to whom they have sold these trade-marks by shipping over to this country goods under those identical trade-marks.

*Id.* at 11603. Senator Moses objected to the section because "[a] case involving its entire principle has been heard in the cir-

cuit court of appeals and is now on its way to the Supreme Court of the United States for final determination." [10] *Id.*

The floor debate was brief,[11] but far-ranging. A number of examples where the section would apply were discussed. In all of them, the sponsors made clear that the purpose of the amendment was to protect an American trademark owner who had purchased the right to use a trademark in America from an independent foreign company. Senator McCumber illustrated the limited scope intended for the section:

> Suppose not only the patent but the trade-mark, which is "Bayer's Aspirin" with a red cross, is sold to an American concern outright. The patent will defend against any importations so long as the patent lasts; but suppose, now, the patent expires. Then the German firm, notwithstanding that they have sold all rights, including the trade-mark, begin to ship in Bayer's Aspirin with the same kind of a trade-mark that they had before, although the right is owned in the United States. According to the decision that was read by the Senator from West Virginia the American purchasers of these rights are entirely unprotected, and this is to give the opportunity to protect the American purchaser. That is all there is to it ....

*Id.* at 11604; *see* remarks of Senator Sutherland, *supra.*

At the end of the debate, Senator Lenroot expressed a concern as to whether the section would apply in a case involving facts similar to the facts at issue here. Senator Lenroot wanted to know whether an international corporation could designate an American agent to register its trademark in the United States and then use that registration to bar unauthorized imports. "I want to inquire whether any American could purchase [the product] abroad and import it without the written consent of [the] agent here in the United States, and if not, why not? There is no

---

**10.** The *Katzel* case was awaiting decision in the Supreme Court at this point.

**11.** The Senate considered the section under a rule limiting debate to ten minutes.

fraud, no deceit." *Id.* at 11605. Senator McCumber clearly did not believe that the section applied to these facts. "[I]f there has been no transfer of trade-mark, that presents an entirely different question.... The mere fact of a foreigner having a trade-mark and registering that trade-mark in the United States, and selling the goods in the United States through an agency, of course, would not be affected by the provision." *Id.* Apparently Senator Lenroot was unconvinced that the language proposed was sufficiently narrow to achieve the stated purpose. He restated his example, making clear that the agent registering the trademark was domiciled in the United States, and stated that under the section the product "could not be bought in the markets of the world and sold here without the written consent of the [trademark owner] or [its] agent domiciled here in America." *Id.*

However, the sponsors of the section apparently did not believe that the section created these rights. And all concerned with the debate believed that the purpose of the section was to reverse the result in *Katzel.*

Shortly after § 1526(a) became law the Supreme Court reversed the Second Circuit decision in *Katzel.* In *Katzel,* the Supreme Court held that the Trademark Act of 1905 outlawed importation of trademark goods from a foreign manufacturer when the foreign manufacturer had sold the American trademark to the plaintiff. The court held that this followed from the law governing assignment of trademark rights. *A. Bourjois & Company, Inc. v. Katzel,* 260 U.S. 689, 691, 43 S.Ct. 244, 245, 67 L.Ed. 464 (1923); Trademark Act of 1905, Pub.L. No. 58–84, § 10, 33 Stat. 727 (1905). In a similar case, the Supreme Court held that § 27 of the 1905 act (§ 1124) required the same result. *A. Bourjois & Co., Inc. v. Aldridge,* 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) *answering questions certified at* 292 F. 1013 (2d Cir.1922).

Since Congress passed § 1526(a) to provide rights that the Supreme Court held were already provided by the Trademark Act of 1905, it is not surprising that the Bureau of Customs issued one set of regulations to implement both statutes. Customs Regulations of 1923, Articles 475–480. These regulations offer little insight into the Bureau of Customs' interpretation of § 1526(a). The relevant language notes that "[t]rade-marks owned by an American citizen ... are entitled to the protection of section 526 ... if the mark has been registered." *Id.* at Article 476. But the regulations do not describe what does or does not constitute a violation of the section.

Section 1526(a) was reenacted without change in the Tariff Act of 1930. Congress debated the section at length in the context of a proposed amendment which would have drastically altered the section.[12] The debate contains only brief references to the existing scope of § 1526(a), but it seems to reflect the views of the original sponsors. Senator Reed noted:

> At the present time the tariff laws forbid the importation of an article bearing a trade-mark registered in America unless the owner of that trade-mark consents in writing to the importation. Obviously the purpose of that provision is to protect the American owner of the trade-mark against importations of articles which have been stamped with his mark without his consent.

71 Cong.Rec. 3873 (1929).

### Administrative Policy and Practice

Customs Regulations issued shortly after the reenactment of § 1526(a) could be read as suggesting that the Bureau of Customs would apply the section broadly.

Prohibition of entry.—Entry is prohibited of imported merchandise bearing a genuine trade-mark when such trade-mark is recorded with the Treasury Department and registered under the trade-mark law of February 20, 1905, if compli-

---

**12.** The proposed amendment would have outlawed importation of all goods bearing a trademark registered by an American citizen. The amendment was intended to compel American trademark owners to produce their goods domestically. 71 Cong.Rec. 3871 (1929).

ance is had with all provisions of section 526 of the tariff act of 1930, provided the period of protection for such trade-mark has not expired.

Customs Regulations of 1931, Article 518(a).

If the Bureau of Customs did intend a sweeping result, that view was short lived. In 1936, the Bureau of Customs issued a new regulation setting out its interpretation of § 1124 and § 1526(a). T.D. 48537 (1936). Article 518 was amended to read:

*Prohibition of importation.*—(a) Merchandise of foreign or domestic manufacture is prohibited importation when it bears a name or mark which copies or simulates a trade-mark or trade name entitled to the protection of the Trade-Mark Act of 1905 or the Trade-Mark Act of 1920, unless such merchandise is imported by or for the account of, or with the written consent of, the owner of the protected trade-mark or trade name.

(b) A name or mark (including a name or mark which is a genuine trade-mark or trade name in a foreign country) on an article of foreign manufacture identical with a trade-mark or trade name protected by the trade-mark laws of the United States, as well as a name or mark on an article of foreign or domestic manufacture counterfeiting such protected trade-mark or trade name, or so resembling such protected trade-mark or trade name as to be likely to cause confusion or mistake in the minds of the public or to deceive purchasers, shall be deemed for the purposes of these regulations to copy or simulate such protected trade-mark or

trade name. *However, merchandise manufactured or sold in a foreign country under a trade-mark or trade name, which trade-mark is registered and recorded, or which trade name is recorded under the trade-mark laws of the United States, shall not be deemed for the purpose of these regulations to copy or simulate such United States trade-mark or trade name if such foreign trade-mark or trade name and such United States trade-mark or trade name are owned by the same person, partnership, association, or corporation.*

T.D. 48537 (1936) (emphasis added).

The new regulation appears to respond to the concerns raised by Senator Lenroot in the initial debate over § 1526(a). Goods of foreign manufacture bearing a genuine trademark were prohibited imports absent the American trademark owner's consent.[13] But this protection was not extended if the same entity owned the foreign and domestic trademarks. Thus, the plaintiff in *Katzel* that bought the United States trademark rights to a product was protected. Imports of genuine goods bearing the trademark of the foreign company that sold its U.S. rights were outlawed. But the 1936 regulation bars a company from registering a trademark in both the United States and abroad, selling the trademarked goods in both markets, and restricting the importation of the goods it sells abroad.[14]

The essential thrust of this regulation has remained unchanged since 1936.

---

**13.** Plaintiff and *amicus curiae* COPIAT contend that the 1936 regulations do not limit § 1526(a). They note that the limiting language of Article 518 is only directed to imports bearing a trademark that copies or simulates a registered trademark. They argue that § 1526(a) does not refer to marks that copy or simulate a registered mark so the regulation does not limit § 1526(a). The court rejects this construction of the regulation. Article 518 plainly states that a trademark on an article of foreign manufacture *identical with* an American trademark "shall be deemed for the purposes of this regulation to copy or simulate" the American trademark. § 1526(a) is specifically targeted at these articles. There-

fore, it seems Customs intended Article 518 to implement § 1526(a).

**14.** In testimony before Congress, the United States Tariff Commission contended that § 1526(a) could not be so limited, and that the 1936 regulation only applied to enforcement of § 1124. Hearings on H.R. 82 before the Subcommittee of the Senate Committee on Patents, 78th Cong. 2d Sess. 86–87 (1944). This construction is not entitled to substantial weight since the Tariff Commission was not the agency charged with enforcing § 1526(a). As discussed in note 13, *supra,* the Commission's construction of the 1936 regulation is plainly wrong.

In 1953, the Bureau of Customs expanded its construction of the limits on § 1526(a). T.D. 53399 (1953). The new regulation, 19 C.F.R. § 11.14, denied trademark owners the right to prohibit imports if the American and foreign trademarks were owned by related companies as defined by § 45 of the Lanham Act, Pub.L. No. 79–489, 60 Stat. 443 (1946).[15] This regulation was consistent with Customs' policy in the application of the prior regulation. Commissioner of Customs Frank Dow explained Customs' policy in a 1951 letter to Senator Paul Douglas.

> As interpreted by the Bureau, section 526 prohibits importation of genuine articles of foreign origin bearing a genuine trade-mark valid in the foreign country which articles were not produced by or with the authority of the United States owner of such mark. . . .
>
> However, if the United States trademark owner and the owner of the foreign rights to the same mark are one and the same person, articles produced and sold abroad by the foreign owner may be imported by anyone for the reason that the trade-mark owner has himself introduced the articles into commerce or authorized such introduction and may not unreasonably restrict the use of the product thereafter. For this purpose a foreign subsidiary or licensee of the United States trade-mark owner is considered to stand in the same shoes as such trade-mark owner.

In 1959, the Bureau of Customs amended 19 C.F.R. § 11.14 to eliminate the provision for related companies. T.D. 54932 (1959). There is no evidence that this amendment reflected a substantive change in Customs' policy, especially since the amendment retained the limitation based on ownership of the foreign and domestic trademark by the same person, partnership, association, or corporation.

The Bureau of Customs reaffirmed its interpretation of § 1526(a) in a pair of letters in 1962 and 1963, a series of letters in 1968 and 1969, and a 1969 Treasury decision. Deputy Commissioner Flinn wrote in 1963:

> It has been the Bureau's position for many years that in permitting anyone to import merchandise manufactured or sold by the foreign parent or subsidiary corporation of an American trademark owner is the correct interpretation of section 526 of the tariff act and section 42 of the trademark law.

And in 1962 he wrote:

> It is the Bureau's opinion that a foreign wholly owned subsidiary and its United States parent corporation are the same corporation within the meaning of section 11.14(b) of the Customs Regulations. This interpretation has been consistently applied for some years before insertion of the "related companies" provision in the customs regulations and since the "related companies" provision was deleted from the regulations in 1959.

In 1968, Paul K. McCarthy, Assistant Director (Restricted Merchandise) for Customs wrote Peter Gray, the Managing Director for plaintiff's predecessor corporation:

> [I]t is our position that only trademarks, on foreign-made products, which were unauthorized when introduced into foreign commerce are prohibited importation under section 1526, title 19, United States Code. Thus if any goods sold to markets abroad by a foreign branch, subsidiary, or agent should be offered for importation into the United States, those goods would be considered to bear genuine "VIVITAR" trademarks and would be admissible to entry. This position is based on the legislative and judicial history of 19 U.S.C. 1526.

---

**15.** Section 45 of the Lanham Act provides in relevant part:

> The term "related company" means any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used.

And in 1969, Mr. McCarthy wrote again to Mr. Gray analyzing the statutory basis for Customs' interpretation.

> The purpose of the relevant law, section 1526, title 19, United States Code, is to protect American firms which have bought trademarks from foreign firms, against fraudulent competition by the foreign firms. Obviously this purpose is not served when an American trademark owner authorizes foreign use of his genuine trademark, even though it is not intended that merchandise so marked will be imported into the United States.

And T.D. 69–12(2) (1969) provides:

> *Trademarks and Trade Names.*—The trademark or trade name on imported foreign-produced merchandise shall not be deemed to copy or simulate a registered trademark or trade name, if the foreign producer is the parent or subsidiary of the American owner or the firms are under a common control. Further, if a foreign producer has been authorized by the American owner to produce and sell goods abroad bearing the recorded trademark or trade name, merchandise so produced and sold is deemed admissible.

In 1972, the Bureau of Customs revised 19 C.F.R. § 11.14. The new regulation, 19 C.F.R. § 133.21, embodied the construction of § 1526(a) which the Customs Service (previously named Bureau of Customs) had generally maintained, from 1936.[16] The regulation makes clear that Customs will not restrict genuine imports bearing a trademark registered in the United States if the foreign and domestic trademark owners are the same, closely related, or the American trademark owner consented to the application of its trademark to the imported goods. The Justice Department's comments on the regulation provide a detailed analysis of, and further justification for, Customs' interpretation of § 1526(a). Justice analyzed the litigated history of the *Katzel* case and the legislative history of § 1526(a) and agreed that Congressional intent and public policy required a narrow reading of § 1526(a). Letter from Walker B. Comegys, Acting Assistant Attorney General, Antitrust Division to Myles J. Ambrose, Commissioner of Customs, dated April 19, 1971.[17]

Although Customs' stated policy seems clear, there is some evidence that the Bureau of Customs did not always apply its construction of § 1526(a) uniformly. In the hearings on the Lanham Act, the Justice Department objected to New Jersey Zinc Company's use of its trademark to restrict imports.

> [Section 1526] obviously was designed to prevent the importation into the United States of foreign merchandise bearing counterfeit trade-marks, etc. It was the ingenuity of the New Jersey Zinc Co.'s lawyers to pervert this provisions [sic] of the Tariff Act to serve their own purposes, namely, to exclude absolutely from the United States zinc produced abroad under licenses granted by New Jersey Zinc Co. under its patents and

---

**16.** *See* footnote 3, *supra.*

**17.** Plaintiff contends that the Customs Service's interpretation of § 1526(a) as explained by the Justice Department should be given little weight because it has not been consistently maintained. Plaintiff relies heavily on an *amicus curiae* brief filed by the Antitrust Division and signed by the Chief Counsel of the Customs Service in *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42 (2d Cir.1983). The brief does not persuasively demonstrate any inconsistency in policy. The focus of the *Mamiya* case is the right of a trademark owner to enjoin the importation of goods bearing infringing trademarks under § 1124. The brief discusses at length the policies involved in trademark infringement and the relevance of antitrust law. The brief mentions § 1526(a) only in passing and suggests that the legislative history of the various trademark laws does not conclusively require the court to limit protection of the trademark laws when an American trademark owner is related to a foreign manufacturer of the trademarked goods. Because the *Mamiya* brief focuses on trademark infringement and antitrust issues and not on § 1526(a), and because the brief does not attempt to comprehensively analyze the policy or legislative history behind § 1526(a), the court does not consider the brief directly inconsistent with Customs' long maintained position on § 1526(a).

bearing New Jersey's trade-mark as required by New Jersey.

Hearings on H.R. 82 before a Subcommittee of the Senate Committee on Patents, 78th Cong., 2d Sess. 68 (1944). Also, the briefs filed by the Justice Department in an antitrust action indicated that Customs was excluding perfumes bearing American trademarks even though the foreign trademark for the perfumes was owned by companies related to the American trademark owners. *United States v. Guerlain, Inc.*, 155 F.Supp. 77, 79–80 (S.D.N.Y.1957), *vacated and remanded*, 358 U.S. 915, 79 S.Ct. 285, 3 L.Ed.2d 236 (1958), *dismissed*, 172 F.Supp. 107 (S.D.N.Y.1958).[18]

The Bureau of Customs' exclusion of goods bearing the Guerlain and the New Jersey Zinc trademarks appears contrary to Customs' policy as contained in their regulations and the letter of Commissioner Dow. It is especially difficult to see how Customs could exclude the goods in *Guerlain* if Customs knew the foreign and the domestic trademark owners were commonly controlled. This would have been directly contrary to the newly promulgated Customs regulations of 1953.

John F. Atwood, a Customs Law Specialist, provides a plausible explanation for this apparent inconsistency in practice in his comprehensive review of Customs' interpretation of § 1124 and § 1526. In discussing the *Guerlain* case, he concludes that the Bureau of Customs "had always denied complete exclusionary protection to an American trademark registrant when it knew the importer to be a subsidiary or parent of the foreign user of the trademark. Prior to 1953, however, the Customs Regulations were not set up to specifically elicit this kind of information." Atwood, *Import Restrictions on Trade-marked Merchandise—The Role of the United States Bureau of Customs* 59 Trademark Rep. 301, 307 (1969). "[S]ome Customs trademark recordants who had recorded before 1953 undoubtably continued to be permitted to exclude merchandise from their foreign supplier, since Customs did not know of the relationship between the two entities." *Id.* at 310. This interpretation is supported by the Customs Regulations governing recording of trademarks. Customs Regulations of 1936, Article 519.

Therefore, the court concludes that, since 1936, Customs, in essence, has construed § 1526(a) so as to deny American trademark owners the right to exclude goods manufactured abroad bearing their trademarks, when control of the foreign trademark is in the hands of the American trademark owner. Customs, in its own writings, and in the writings it gathered in the regulation promulgation process, has provided persuasive exegesis of the legal justification for this construction. *See* letters of Commissioner Dow, Mr. McCarthy, and Mr. Comegys. Thus, this construction is entitled to substantial weight. *Securities and Exchange Commission v. Sloan*, 436 U.S. 103, 117–118, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978). Customs' longstanding construction has been consistently applied since at least 1962, and, as discussed above, probably reflects Customs general practice under its regulations since 1936.

### Congressional Ratification

In 1976 and 1978, Congress indicated its acceptance of Customs' interpretation of § 1526(a) by failing to amend § 1526(a) when it enacted legislation closely related to this provision. In 1976, a House Report, prepared as background for the proposed

---

**18.** *Guerlain* is one of several antitrust actions involving a group of closely related French perfume manufacturers and their American distributors. The Justice Department alleged that the defendants monopolized the importation and use of their product. The American distributors prevented any competitors from importing the French manufacturers' trademarked products by registering the identical trademarks in the United States and demanding that the Bureau of Customs exclude any imports by competitors. Apparently the Bureau of Customs excluded competing imports despite the close relationship between the foreign manufacturers and the American distributors. Brief of the United States on Motion to Vacate Judgments and to Remand to the District Court for Consideration of Motion to Dismiss Filed by United States, *Guerlain, Inc. v. United States*, 358 U.S. 915, 79 S.Ct. 285, 3 L.Ed.2d 236 (1958).

Customs Modernization Act of 1975, carefully examined the administrative practice under § 1526(a). The report noted that § 1526:

> has been consistently interpreted by the United States Customs Service for the past 20 years as excluding from protection foreign-produced merchandise bearing a genuine trade-mark created, owned, and registered by a citizen of the United States if the foreign producer has been authorized by the American trade-mark owner to produce and sell abroad goods bearing the recorded trade-mark.

H.R.Rep. 138, 94th Cong., 2d Sess. 54 (1976). In 1978, another House Report repeated the analysis of the 1976 report. H.R.Rep. 621, 95th Cong., 1st Sess. 27 (1978). Both reports were prepared in the context of proposals for substantial amendments to § 1526.

In 1978 Congress adopted two major amendments to § 1526. The first permitted travelers to freely import trademarked goods for personal use. Pub.L. No. 95-410, 92 Stat. 903 (1978), (19 U.S.C. § 1526(d)). The second specified the procedure to be followed by the Customs Service when it discovers imported goods bearing a counterfeit mark. 92 Stat. 903–904, 19 U.S.C. § 1526(e). Congress examined Customs' administrative practice towards imports bearing both genuine and counterfeit trademarks. After this examination, Congress decided to define strict statutory standards for imports bearing counterfeit marks while not altering Customs' administrative practice concerning imports bearing genuine marks. This failure to alter § 1526(a) is sufficient indication of Congressional acquiescence in Customs' administrative practice. *Haig v. Agee*, 453 U.S. 280, 301, 101 S.Ct. 2766, 2779, 69 L.Ed.2d 640 (1981).[19]

### Validity of Current Agency Interpretation

This case presents a conflict between the expansive literal language of § 1526(a) and the much narrower construction contained in the legislative history and administrative practice. The court will not determine the scope of § 1526(a) by mechanically applying the language of the statute. Nor will it blindly defer to administrative practice or the legislative history. The court must determine the scope Congress intended for § 1526(a) from all these sources.[20]

The court will give deference to a longstanding agency construction and practice under a statute it is charged with administering. *Commonwealth Oil Refining Co. v. United States*, 60 CCPA 162, 173–177, 480 F.2d 1352 (1973). The agency construction will be upheld if it is a reasonable interpretation of the statute. The court "'need not find that [the agency's] construction is the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings.'" *Ze-*

---

19. Plaintiff contends that Congressional approval should not be inferred since neither the Senate Report nor the Conference Report discuss Customs' administrative practice concerning § 1526(a). This contention is not persuasive. The Conference Report notes that the Conference Committee considered whether the new § 1526(e) would apply to all goods regulated by § 1124 or only counterfeit goods. Section 1124 regulates imports of genuine goods, counterfeit goods, and goods bearing marks deceptively similar to registered trademarks. The Senate accepted the House position that the section should only apply to counterfeit goods. It is reasonable to assume that the conference accepted Customs' policy concerning genuine goods. *See* H.R.Rep. 1517, 95th Cong., 2d Sess. 17 (1978), U.S.Code Cong. & Admin.News 1978, p. 2211.

20. Plaintiff argues at length that the court should not consider the legislative and administrative history of § 1526(a) because the plain language of the statute would allow plaintiff to prevail. The statutory language is, of course, fundamental to understanding Congressional intent. But even though "courts are ordinarily dutybound to interpret statutes in accordance with their clear meaning, statutory clarity does not bar a court's consideration of legislative history where such history clearly indicates 'that Congressional intent differed from that manifested by the language used.'" *British Steel Corporation v. United States*, 6 CIT ——, 573 F.Supp. 1145, 1148, *quoting Zenith Radio Corporation v. United States*, 1 CIT 180, 184, 509 F.Supp. 1282 (1981). See also discussion *supra* at page 426.

*nith Radio Corporation v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978), *quoting Unemployment Compensation Commission v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946).

■ Customs' construction of § 1526(a) is entitled to even greater deference here because, despite substantial controversy, Customs has consistently maintained it and Congress accepted it when the interpretation was brought to its attention while it was amending § 1526. *Zemel v. Rusk,* 381 U.S. 1, 11–12, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965); *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 313, 53 S.Ct. 350, 357, 77 L.Ed. 796 (1933).

■ Therefore, the question is whether Customs' interpretation is "sufficiently reasonable" to be accepted by this court in light of the normal aids to statutory construction. *Zenith Radio,* 437 U.S. at 450, 98 S.Ct. at 2445; *Train v. Natural Resources Defense Council,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975). The court is convinced that Customs' interpretation is a reasonable construction reflecting Congress' intent, and in fact is a necessary construction of the statute to avoid results Congress clearly did not intend.

To determine the meaning Congress intended for a statute, the court must look to "the evil it was designed to remedy ..., the situation as it existed, and as it was pressed upon the attention of Congress." *Church of the Holy Trinity,* 143 U.S. at 463, 12 S.Ct. at 513; *see also Federal Deposit Insurance Corporation v. Tremaine,* 133 F.2d 827, 830 (2d Cir.1943). This rule has special force in this case because the sponsors of § 1526(a) repeatedly stated that the purpose of the section was only to reverse the *Katzel* decision. As shown by the legislative history, Congress adopted § 1526(a) to protect an American trademark owner, like the one in

*Katzel,* who had purchased the trademark of an independent foreign company. Congress decided it was unfair to permit unauthorized imports of goods bearing the foreign company's trademark. These imports violated the rights the American trademark owner purchased from the foreign company in an arms-length transaction. This is the problem Congress was confronted with by the *Katzel* decision, and the sole purpose of § 1526(a) was to resolve this problem.

■ Moreover, construing § 1526(a) to apply when a foreign source of imports is related to, or the agent of, the American trademark owner could lead to results that Congress could not reasonably have intended when it enacted the section. Plaintiff's reading of § 1526(a) would give a foreign manufacturer of trademarked goods a competitive advantage over an American manufacturer when both were engaged in worldwide marketing of their product. Since § 1526(a) only applies to goods manufactured abroad, the American manufacturer would not be able to employ § 1526(a) to restrict unauthorized imports of its goods sold by its overseas distributors.[21] *See* § 1526(a), footnote 2 *supra.* But the foreign manufacturer could form an American subsidiary corporation, transfer the American trademark rights to that corporation, and then have the subsidiary use § 1526(a) to restrict any unauthorized imports of the foreign manufacturer's goods. The only way an American trademark owner could overcome this marketing advantage is by moving its manufacturing operations abroad so it too could restrict access to the United States market.

The Tariff Act of 1922 is "An Act To ... encourage the industries of the United States." Tariff Act of 1922, Pub.L. No. 67–318, Preamble, 42 Stat. 858 (1922). Congress was, in large part, motivated by a desire to protect American industry from the competitive advantages it saw available to foreign industry. S.Rep. No. 595, 67th Cong., 2d Sess., 1–3 (1922), H.R.Rep. No.

---

**21.** Although this scenario does not appear to raise problems under current market conditions, it is nonetheless a possibility under plaintiff's construction.

248, 67th Cong., 1st Sess., 1–2 (1921). It is difficult to believe that a Congress so concerned with protecting American industry would give foreign industry an important competitive advantage that could only be remedied by American industries fleeing abroad. This result is particularly unreasonable given that § 1526(a) was intended to protect "the property rights of American citizens who have purchased trade-marks from foreigners ... when these foreigners deliberately violate these property rights." 62 Cong.Rec. 11603. No member of Congress involved in the debate of § 1526(a), which was enacted as part of the Tariff Act of 1922, believed that the purpose of § 1526(a) was to encourage the foreign manufacture of trademarked goods. Plaintiff's interpretation of § 1526(a) would permit an unintended construction of the literal language of § 1526(a) to give a competitive advantage to foreign manufacturers contrary to the basic purposes of the Tariff Act of 1922 and the expressed Congressional intent in enacting § 1526(a).

Plaintiff contends that the Customs Service's interpretation of § 1526(a) is unreasonable because it permits gray market importers to unfairly exploit plaintiff's good will.[22] According to this argument, plaintiff markets goods bearing its trademark under a variety of different circumstances worldwide. In some markets, plaintiff's goods are marketed with a minimum of supporting expenses. Plaintiff contends that the low price for its goods in these markets reflects minimal expense on advertising, merchandising, customer services and warranties. In the United States, plaintiff incurs substantial expenses in support of its trademark. It advertises the quality of its mark extensively. It maintains a wide network of authorized distributors to insure quality and widespread availability. It offers a variety of customer services. And it offers an extensive warranty program. Plaintiff contends that its higher prices in the United States reflect the added expenses incurred in building its reputation. Plaintiff contends that sellers of gray market goods who purchase goods abroad, which are not priced to reflect the reputation plaintiff built in the United States, "free ride" on plaintiff's reputation here.[23]

There are several answers to this argument. Intervenor contends that it does not free ride on plaintiff's reputation because it also incurs substantial advertising, marketing, and warranty expenses on behalf of goods bearing plaintiff's trademark. Also, plaintiff could protect itself against free riding by using marketing and labeling practices to make clear that goods plaintiff sells abroad are not supported by the same services as those plaintiff sells in the United States.

But the fundamental answer to this argument is that it poses a problem that § 1526(a) was not intended to deal with. Congress enacted § 1526(a) as a special remedy to protect American businesses that purchase foreign trademarks from imports that violate the rights the American businesses purchase. On the other hand, free riding can be a form of unfair competition affecting any trademark owner. Free riding is regulated under the Lanham Act, 15 U.S.C. § 1114, and by non-statutory law. *See, e.g., Professional Golfers Association v. Bankers Life & Casualty Co.,* 514 F.2d 665, 670–671 (5th Cir.1975). Plaintiff would apparently have the court infer that Congress intended § 1526(a) as an additional remedy for violations of the law of unfair competition generally. There is no evidence that Congress intended such a sweeping scope to § 1526(a), and the court declines to so interpret it.

**22.** The United States District Court in *Osawa & Co. v. B. & H. Photo,* 589 F.Supp. 1163, 223 U.S.P.Q. 124 (S.D.N.Y.1984) accepted this theory when it expressed strong doubt as to the validity of Customs' current policy under § 1526(a).

**23.** It should be noted that this alleged free riding only exploits plaintiff's added costs in the United States. When plaintiff sells its goods abroad through its overseas distributors it receives full value for the cost of making and distributing the goods abroad.

■ If plaintiff is suffering from unfair competition generally, relief might be available under the Lanham Act or other laws.[24] But plaintiff has brought his claim under § 1526(a) and has not attempted to prove the elements of a claim for unfair competition. Plaintiff seeks an unqualified right to demand exclusion of unauthorized imports bearing its trademark. Section 1526(a) does not give plaintiff this right.

Finally, the court is reluctant to disturb the Customs Service's longstanding construction of § 1526(a) because of the substantial commercial reliance on Customs' interpretation. Customs has uniformly applied this interpretation since at least 1962, and business has been built based on this interpretation. Reliance, of course, would not justify Customs' maintaining a position clearly contrary to law, nor is it sufficient to persuade the court not to entertain plaintiff's suit on the grounds of laches. But as discussed above, Customs' construction of § 1526(a) is reasonable and consistent with Congressional intent. Congress has acquiesced in this interpretation despite continuing public controversy. Congress is best suited to determine whether the current balance in trademark rights in international commerce is inappropriate.

**THEREFORE, IT IS ORDERED:** Plaintiff's motion for summary judgment is denied. Defendants' motion for summary judgment is granted.

---

**24.** Whether this court has jurisdiction to grant relief regarding unfairly competing imports is an open question upon which this court express-es no opinion. The court does not wish to imply by this discussion that plaintiff has an unfair competition claim.